# No. 14,231.

## SMALDONE ET AL. *v*. THE PEOPLE.
### (88 P. [2d] 103)

Decided December 19, 1938. Rehearing denied March 13, 1939.

Mr. RALPH L. CARR, Mr. JEAN S. BREITENSTEIN, Mr. JOHN H. SHIPPEY, Mr. RALPH J. CUMMINGS, Mr. ARTHUR R. MORRISON, for plaintiffs in error.

Mr. BYRON G. ROGERS, Attorney General, Mr. REID WILLIAMS, Assistant, for the people.

*En Banc.*

MR. JUSTICE YOUNG delivered the opinion of the court.

THE plaintiffs in error are three of the four defendants in a criminal action instituted in the district court of the City and County of Denver. For convenience they will be collectively designated as they there appeared. They were found guilty by a jury on each of two counts of an information charging an assault with intent to kill and murder, and a conspiracy to kill and murder, Leo Barnes. Sentences were imposed on the verdicts, and to reverse the judgment they present the case here by writ of error.

The defendants charged were Clyde Smaldone, Eugene Smaldone, alias Checkers Smaldone; Ova Elijah Stephens, alias Charles Stephens, alias Charles Belmont; Edward A. O'Hara, alias Edward A. O'Hare, alias Allen Edward Doring, alias Homer Ward, alias Edward Oliver O'Hare, alias Baldy; John Doe and Richard Roe. The court directed a verdict of not guilty as to defendant O'Hara. The others, excluding John Doe and Richard Roe, were each found guilty on both counts of the information.

The record and bill of exceptions are of considerable length, containing more than 1600 folios. A statement of the evidence at some length and in detail is necessary to an understanding of the errors assigned and the legal propositions involved.

On December 8, 1936, at about 7 p. m., Leo Barnes entered his car and stepped on the starter. An explosion followed, shown by expert evidence to have been produced by dynamite, which wrecked the car and seriously injured Barnes. At the time his car stood at the curb on Grant street in front of Barnes' apartment. The explosion was of such severity that claim logically could not be made, and in fact there was no contention, that it was caused for any purpose other than to effect the death of Barnes. One witness, Mrs. Jack Gilmore, whose car was parked at the curb behind the Barnes car, testified that on this date, a little before 7 p. m., she saw two men, whose car was double parked alongside the Barnes car, standing by and working at something inside of the

car. One of these she identified as the defendant Eugene
Smaldone. She further testified that a Daniels and
Fisher delivery truck was being pushed by two men south
along Grant street at the same time and she was cor-
roborated in this statement by a driver for the Daniels
and Fisher Stores Company, who said his truck was
stalled there at about that time and that he had to push
it around a double parked car. She waited until the men
drove away, and then pulled out from the curb, drove a
few blocks on an errand, returned and found that the
explosion had occurred in the interim and that the Barnes
car was on fire. About 6:10 p. m. officer Williams saw
Clyde Smaldone coming out of a telephone booth in a
drug store located at 10th street and Broadway, which
is about three blocks from 10th and Grant streets where
the explosion occurred. Clyde Smaldone, after his ar-
rest, admitted being at the drug store; explaining that
he was on his way to Pueblo and had stopped to phone
to his wife. He said he learned next day that he was
wanted by the Denver officers and phoned them from
Pueblo that he would return.

Leo Barnes was a professional gambler and by his own
admissions had a most unsavory record, including two
criminal convictions, one for a violation of the Dyer act
in Chicago and one for highway robbery in Kentucky.
He testified that he had been the manager of the dining
room for defendant Stephens at Blakeland Inn, a gam-
bling resort in Douglas county, and that he had a five per
cent interest in that enterprise. He testified also that
Stephens was indebted to him at the time of the explosion
in the sum of $7,000, and another witness testified that
he had seen Stephens give Barnes money at various times
after Blakeland was closed, on one occasion money to
buy an aeroplane. Blakeland Inn had been closed in
June of 1936 by the authorities and Stephens, his nephew
Harrison Stephens and Barnes were enjoined from fur-
ther operation of such a place in Douglas county. Before
the place was closed it is in evidence that Stephens had

taken out of the venture $350,000. Prior to the closing of Blakeland Inn Stephens had embarked on another enterprise in Denver known as Mammoth Skating Rink and had leased Blakeland to Jerry La Sasso and Tommy Abdoe who operated it for a time after which, the rink proving to be a losing proposition, Stephens again took over Blakeland which he operated nights, La Sasso and Abdoe continuing to run it during the day. The Smaldones worked for La Sasso and Abdoe, and some nights for Stephens. Stephens testified that a few months after Blakeland was closed Barnes came to him and asked him if he, Stephens, would go in with him in another gambling enterprise if he could find a suitable location and that he agreed to do so if he, Barnes, could find such a place; that a little later Barnes returned and said he had rented Mrs. Luco's place situated on the same property as Blakeland; that he told Barnes that being under an injunction not to operate in that locality he did not want to go down there; that Barnes then went to La Sasso who came to him to find out what he thought of the proposition and that he told him it might be all right. Stephens further testified that after this incident Barnes talked with him several times about opening at Mrs. Luco's place, called the Cottonwood Ranch, but said nothing about him, Stephens, going into it until after he, Barnes, had opened it and the place had been closed by the officers; that on December 4th, after Cottonwood Ranch had been closed by the authorities and while it was still closed Barnes again came to see him at the Brown Palace Hotel about reopening it. He said Barnes offered him $33\frac{1}{3}$ per cent of the proceeds if he would join him, but that he did not want to go in because he did not think they could run it. Barnes' version of this conversation, which the jury was at liberty to believe, and which we may assume did believe, was that he asked Stephens if he had any objection to him reopening Cottonwood Ranch and that Stephens said he had none if he was ''cut in,'' so Barnes offered him 20 per cent, that Stephens demanded $33\frac{1}{3}$

per cent and told him if he went into it alone he would not live a week. This was Friday and Barnes proceeded with his preparations to reopen the place alone. It has a significant bearing on the question of Barnes' apprehension of danger that immediately after this conversation Barnes in company with a well known attorney went to the police station to obtain permission to carry a gun, as he admitted at the trial, he had carried a gun before and he did so after this time. In fact two guns were found in his car after the explosion.

All the time Barnes was operating Cottonwood Ranch he had the safe and some of the office equipment which Stephens had used in operating Blakeland Inn. Stephens said he let him take the safe and gave him the key to Blakeland so that he might get what he wanted.

November 9, 1936, Cottonwood Ranch was robbed by seven men, two of whom were identified by witness Michael as Eugene and Clyde Smaldone, and the safe containing $1,600 was taken. Eugene Smaldone was arrested and questioned concerning the robbery, and Stephens at the time of the conversation in the Brown Palace Hotel on December 4th knew that there had been an attempt to implicate the Smaldones in the robbery.

Stephens testified that on the afternoon of December 8th he was at the restaurant conducted by the father of Eugene and Clyde Smaldone to see him concerning the sale of an ice box he, Stephens, owned in Colorado Springs and he at that time measured the space it was to fill to see if it was sufficient. There he saw Clyde and Eugene and their younger brother. They agreed on a price of $50 for the ice box. Stephens testified further that about six o'clock in the evening of December 8th, pursuant to a previous engagement, Alma Bazemore, a former employee at Blakeland, came to his room at the Brown Palace Hotel, that they had a dinner engagement and that his chauffeur, Vincent Millan, was present, that he, Stephens, and the girl played casino until a telephone call came through for Stephens. On this occurrence the

504

testimony of Alma Bazemore is to the effect that the telephone call came in about 7:45; that Stephens left immediately after the call; that she was in the room continuously from her arrival until she was arrested by the police about twenty minutes after Stephens left and that no other telephone call was received. Stephens' testimony is that Clyde Smaldone had told him in the afternoon that he would call him in the evening to see if he, Stephens, was going to Colorado Springs and if he would bring the ice box back with him, and that he, Clyde, had promised to have the money; that when the call came he thought it was Clyde speaking and said: "All right Clyde, I will come over and see you," and hung up. That he then took a yellow cab, notwithstanding his own chauffeur was in the room and his car in the garage across the street, and went to Clyde's house, stopping a few doors beyond it and walking back; that the house was dark, but that in a few minutes Eugene Smaldone and O'Hara came up and Eugene paid him $25.00, half the money due for the ice box. Eugene testified that his brother Clyde told him to call Stephens and that when Stephens answered as above indicated and hung up he knew he had mistaken him for Clyde. His testimony is as follows: "Q. Where did you go at eight o'clock? A. At eight o'clock? Q. Yes, or about eight. A. Down to my brother's house. Q. How did you come to go to your brother's house? A. Because when I took him down to get his car, he told me to call up Mr. Stephens and give him twenty-five dollars for payment on an electric refrigerator. Q. Did you call Mr. Stephens that night? A. Yes, sir. Q. At about what time? A. Between seven-thirty and eight o'clock. Q. What did Mr. Stephens say? A. I asked for Mr. Stephens on the phone, and he says, 'Just a minute.' And then I says, 'Mr. Stephens?' He says, 'Yes.' I says, 'Can you come over and get your money for the electric refrigerator?' He says, 'All right,' and hung up, before I had a chance to tell him who I was. Q. After he hung up what did you

do? A. I immediately called back, but he was gone.''
It is to be noted that there is nothing in his version of
what Stephens said to indicate any mistake on the part
of Stephens as to whom he was talking; that he says he
called back immediately but that Stephens was gone,
though Alma Bazemore testified that no other call came
in.

Stephens was arrested as he alighted from his cab
across the street on the 17th avenue side of the Brown
Palace Hotel and with Alma Bazemore and Vincent
Millan, arrested a few minutes before, he was taken to
the police station where all were questioned that night.
Detective Childers testified to numerous discrepancies in
Stephen's story of his activities during the afternoon and
evening of December 8th, among which were the state-
ments that at the restaurant of Smaldone Sr., he saw no
one but the latter, a younger brother of Clyde and Eu-
gene, and a party unknown to him; that the phone call
was from a young lady with whom he had a date; that
he went down to the lobby of the hotel and she was not
there. He said later the call was from Clyde Smaldone;
that he went to the lobby and not finding him he took a
cab and proceeded to his house which was unlighted; that
he rang the bell, waited a short time, and returned to
town; later he said that while he was there Eugene and
O'Hara came up in a car; that at Clyde's house they
talked about the sale of the ice box and that he returned
to town and was arrested as he started across the street
to the hotel after getting out of the cab.

Detective Childers testified that he talked to Clyde
Smaldone December 9th and that the latter stated he
arrived in Pueblo about 8:30 p. m. the night before; that
he had not seen Stephens after he was at his father's
place in the afternoon of December 8th; that he stopped
at a drug store at 10th street and Broadway on his way
to Pueblo to call his wife and met a police officer; that
nothing was said about an ice box at the time Stephens
was at his father's place in the afternoon.

All of the defendants except Clyde Smaldone, who did not take the stand, denied any part in, or connection with, the crimes charged.

Before considering the assignments of error it will tend to clarify the matter if the implications to be drawn from the foregoing situation are set forth. Defendant Stephens clearly occupied a position of importance in the gambling fraternity within the sphere in which he operated. He had pursued his activities long and extensively and had amassed a fortune. He, with Barnes and a nephew, Harrison Stephens, whom he said were merely his employees, but who Barnes said had each a five per cent interest in the enterprise, were enjoined from further activities in gambling and Blakeland closed. Barnes said that $7,000 was due him on his five per cent split of the spoils. Stephens, though he had since given him money, denied the obligation. With Blakeland closed, Barnes came to Stephens with a plan of again engaging in their former illicit operations and Stephens said he was agreeable if Barnes could find a suitable place. Pursuant to this conversation Barnes leased Cottonwood Ranch, opening a resort in a house within a quarter of a mile from the old place, Blakeland. Stephens, having in mind the injunction, demurred to locating so near their former place of operations. Jerry La Sasso, a former lessee of Blakeland, asked Stephens what he thought of it, and Stephens said it might be all right. Stephens gave Barnes a key so that he might get what he needed at Blakeland, particularly the safe that had been used there. Barnes opened the place with La Sasso and Tony Abdoe as partners, operated a month and had $1,600 profits in the safe on November 9th, when the house was robbed and the safe taken by seven men, two of whom were identified as Eugene and Clyde Smaldone. The place continued to operate after November 9th and during the weeks following netted the operators a profit of $7,000, when it was again closed by the authorities. While the resort was closed and on December 4th, Barnes went again to Steph-

ens, who had apparently remained on the side lines waiting to see if the Cottonwood Ranch project worked out all right, and asked if he had any objection to Cottonwood Ranch again being opened. Remembering that Stephens had told Barnes if he could find a satisfactory place that he would go in with him; that he had told La Sasso that it might be all right to operate at Cottonwood; that the place had made a profit of $8,600 in two months operated principally by a man whom Stephens said had been merely his employee, that Stephens said he had connections and that Barnes did not have any; that Stephens had not put any money into the place; that Barnes offered a cut of twenty per cent and that Stephens demanded 33⅓ per cent, and that Barnes refused such a cut and proceeded with his plans for opening; remembering further that Stephens told him if he opened up without him he would not live a week, the whole situation, including the robbery, forms part of a picture that we think the jury were entitled to consider as bearing on the question of Stephens motive for entering into a conspiracy to eliminate Barnes as a factor in the gambling world in which Stephens operated.

The robbery was but an incident to a project agreed upon between Stephens and Barnes; a project that he had not abandoned, but in which he was merely quiescent for the time being and into which he again injected himself by demanding a 33⅓ per cent cut in the profits, accompanied by the threat mentioned if he did not get it. That Barnes was apprehensive of some danger is apparent from his attempt to procure a permit to arm himself. He testified to a threat by Stephens and the attempt lawfully to arm himself followed that threat almost immediately.

Whether or not Stephens knew anything about the robbery is immaterial. The prosecutor apparently thought it could be shown that he did have some connection with it, but we think failed to establish any such connection. One who, as Stephens did, consents to participate in, and authorizes the initiation of, an illegal project

and counsels with those engaging in it; then demands a cut in the illicit gains, even though he for a time remained quiescent in the project, cannot rightfully object to the history of the enterprise being presented by the evidence, even though it involved the commission of a crime by one or more of those who are defendants with him, if the history of such enterprise otherwise throws light on the motive he or his co-defendants might have for committing another crime, and which constitutes a chain of circumstances throwing some light on the probability of their having entered into a conspiracy with him to commit another crime, in this case to kill Barnes.

██ Evidence of reputation, a purely personal matter, admissible against one defendant, but not against another, is not a ground for severance where two or more are charged jointly. Similarly evidence of the motive of one defendant which is admissible on the question of his criminal intent, which, like reputation is a purely personal matter, should not, and we think does not, entitle another defendant to a severance. If the rule were otherwise two persons could not be tried jointly for a crime and evidence admitted that the motive of one was avarice, and of the other revenge for a wrong. Motive for committing a crime is a state of mind and is in its very nature several and personal to the possessor. It is, when shown, a circumstance tending to show criminal intent which is itself a state of mind and of necessity personal to the one entertaining it. But in a conspiracy case, or in case of a crime proceeding out of a conspiracy the several criminal intents of the participators are ingredients of the crime of conspiracy and of the crime constituting its objective. Hence evidence admissible to prove the criminal intent, including the motives of each individual participant, is properly admissible against all whether tried jointly or severally. That one has committed a crime of which he is suspected or charged may constitute a motive for the commission of another crime against the same person. Particularly is this true if the second crime

would conceal or do away with the probability of prosecution for the first. ''The circumstances which might excite a desire to kill are innumerable. It must be understood that the rulings of the courts cover only those circumstances which counsel have cared to question, and that nowadays the fact that counsel care and dare to question a circumstance is not necessarily an indication that there is the slightest rationality in the question. The annals of trials illustrate many other circumstances judicially recognized as capable of becoming motives; and the absence of a ruling by a Supreme Court upon a particular circumstance casts no doubt upon its propriety. Among the instances most commonly offered for adjudication, the following may be noted. * * * The expediency of preventing the discovery of a former crime, or of evading an arrest or a persecution [prosecution] for it, may lead to the desire to kill.'' Wigmore on Evidence (2d ed.) vol. 1, §390. Exemplifying the application of the foregoing rule a large number of cases are cited in the note appended to the section.

The evidence of the holdup certainly was admissible as bearing on the existence of a motive for the Smaldones to make away with Barnes and to enter into a conspiracy as between themselves or with another to accomplish that result. Stephens' admitted knowledge that the Smaldones were suspected of the robbery we cannot say is wholly lacking in probative value as a circumstance pointing to the probability of Stephens entering into a conspiracy with them to dispose of Barnes. That a robbery was committed by Smaldones; they being suspected of it; Stephens having knowledge that they were suspected, plus the facts that one of them was shown to be present and the other in the immediate vicinity at about the time the attempt was made on Barnes' life; that Stephens was expecting a telephone call from one (though ·he says concerning another matter), and received a call from the other, and was in conference with him very shortly after the attempt; coupled also with

Stephens' dire threat three days before that inspired fear in Barnes and the motive of wiping out a $7,000 debt, of which there was no record, claimed to be due from Stephens to Barnes, all suggest the availability of the Smaldones to serve the purpose that Stephens had a motive for carrying out and that he had prophesied to Barnes would be the result of opening Cottonwood Ranch without cutting him in on the profits.

Greenleaf, speaking of the proof of a charged conspiracy, says: "The evidence in proof of a conspiracy will generally, from the nature of the case, be circumstantial. Though the common design is the essence of the charge, it is not necessary to prove that the defendants came together and actually agreed in terms to have that design, and to pursue it by common means. If it be proved that the defendants pursued by their acts the same object, often by the same means, one performing one part and another another part of the same so as to complete it, with a view to the attainment of that same object, the jury will be justified in the conclusion, that they were engaged in a conspiracy to effect that object. Nor is it necessary to prove that the conspiracy originated with the defendants; or that they met during the process of its concoction; for every person, entering into a conspiracy or common design already formed, is deemed in law a party to all acts done by any of the other parties, before or afterwards, in furtherance of the common design." 3 Greenleaf on Evidence (16th ed.) §93.

In the case of *Helser v. People,* 100 Colo. 371, 68 P. (2d) 543, it is said: "Experience has taught that in conspiracy cases an unusual latitude must be permitted in the admission of evidence and this rule is almost universal. As was well said by the court in the case of *Rigsby v. State,* 152 Ala. 9, 14 (44 So. 608): 'The proof of a conspiracy oftentimes, from the very nature of things, is dependent upon circumstantial evidence, and in the establishment of the conspiracy by circumstantial evidence a wide latitude sometimes becomes necessary in

the introduction of the evidence as to the circumstances tending to show a conspiracy; circumstances which, when taken separately, may appear, indeed, very slight, but, when grouped together, become very strong and convincing. A circumstance, when taken separately, may seem irrelevant; but, when taken in connection with some other circumstance, its relevancy becomes apparent'.''

If another conspiracy as in the case at bar, the conspiracy to operate a gambling enterprise, together with the events incident to such operation becomes itself a circumstance throwing light on the motive of any of the parties or the likelihood of their entering into the conspiracy charged we can see no sound reason for its rejection as evidence because the enterprise was illicit rather than lawful. It should be, and we think is, a sufficient answer that the parties themselves brought the circumstance into being and that the law is not concerned with its effect on them whether prejudicial or otherwise, but only with its relevancy as proof of the issues or any one of them, involved in the charge under consideration. The following from Wigmore on Evidence is pertinent to such a situation: ''The general inquiry is, what circumstances tend probably to excite a given emotion? Obviously, the whole range of human affairs is here involved. It would be idle to attempt to catalogue the various facts of human life with reference to their potency in exciting a given emotion. Such an attempt would exhibit two defects. It would be pedantic, because it is impossible to suppose that the operation of human emotions can be reduced to fixed rules, and that a given fact can have an unvarying quantity of emotional potency. It would be useless, because the emotional effect of any fact must depend so often on the surrounding circumstances that no general formula could provide for the infinite combinations of circumstances. Courts have therefore always been agreed that in general no fixed negative rules can be made; that no circumstance can be said beforehand to be without the power of exciting a given emotion; and that, in general,

any fact may be offered which by possibility can be conceived as tending with others towards the emotion in question. * * *

"Nevertheless, courts are often called upon to rule upon the admissibility of various circumstances. It is to their reproach that they heed the majority of these calls. There is in most of the rulings no reason for the slightest doubt of the propriety of the evidence. The extreme vagaries and the desperate pugnacity of many of those who take on themselves the defence of criminals have raised questions which ought to have been silently ignored by the courts—a treatment which would tend much to the discouragement of crime and the lightening of the profession's burden of precedents.

"The criminality of the circumstances involved in proof of the motive has no doubt often been the ground of objection, the character-rule (ante, §94) being invoked in exclusion. But it has already been seen (ante, §216) that the fact that the circumstance offered involves also another crime by the defendant charged is in itself no objection, if the circumstance is relevant for the present purpose." Wigmore on Evidence (2d ed.) vol. 1, §389.

■■ It was not error to refuse defendants' tendered instruction No. 26 limiting the evidence of the Cottonwood Ranch robbery to proof of the charge of the conspiracy. Had there been no charge of conspiracy nevertheless one might have been shown to have been formed to commit the assault to kill and any evidence of such a conspiracy is therefore competent on the charge of assault to kill and might be considered by the jury on that charge.

In *Kolkman v. People,* 89 Colo. 8, 300 Pac. 575, we said: "In *Van Wyk v. People,* 45 Colo. 1, 99 Pac. 1009, the defendants were charged with the crime of murder, and the trial court instructed the jury on the law of conspiracy, and this was assigned as error. Upon this question, at page 11, in disposing of this contention, this court said: 'It is true that the defendants were not charged with

having conspired and confederated together to kill and murder, but they were jointly informed against and charged with murder. Under this charge it was entirely proper to show a conspiracy on the part of the defendants to commit the offense, and the acts and declarations of one conspirator in furtherance of the common design were admissible against both the defendants;' * * *.

"It is not necessary an information should charge a conspiracy, but although no conspiracy is charged, if it is made to appear that there was a concerted action between codefendants, the acts and declarations of one are admissible against the other. 16 C. J. 647.

" 'While the commission of the crime to which a conspiracy relates will in many cases mark the accomplishment of its object and its consequent termination, so as to exclude evidence of subsequent acts or declarations of one conspirator against another, this is not necessarily true, but the conspiracy may continue for various purposes, as for instance * * * the division of such proceeds, the concealment of the crime, effecting an escape, the concealment of evidence tending to incriminate the conspirators, procuring witnesses to leave the state, * * * and where this is the case, the acts and declarations of one conspirator are admissible against the others, where made while the conspiracy continued, although after the actual commission of the crime'." 16 C. J. 661, et seq."

From the foregoing it is clear that while the evidence was admissible on the charge of conspiracy to which defendants sought to limit it, it was admissible on the charge of assault to kill for that very reason and to have advised the jury, as the tendered instruction did, that such evidence could not be considered by the jury in determining the guilt of Stephens, because there was no similarity between the alleged theft of the safe and the crime of assault to kill, would have been clearly erroneous.

Error is assigned to the refusal of the court to

give tendered instruction No. 13 which informed the jury that a conviction on circumstantial evidence alone was proper only when the circumstances relied upon were consistent with guilt and inconsistent with any reasonable hypothesis of innocence. We think it would have been proper to give this instruction; however, the failure to give it amounted to nondirection merely and not misdirection. In *Beeler v. People,* 58 Colo. 451, 146 Pac. 762, an instruction covering this point was given and we held that it was substantially a correct statement of the law and the judgment was affirmed. To the same effect was the court's holding, where a similar instruction was given in *Van Wyk v. People,* 45 Colo. 1, 99 Pac. 1009. Our attention is not called to a case in which such an instruction was tendered and refused but, though cited on another proposition relating to conspiracy, we find in the case of *Solander v. People,* 2 Colo. 48, in which the charge was manslaughter effected by an attempted abortion, that Mr. Chief Justice Hallett said: ''The instruction asked as to the weight to be given to circumstantial evidence was correct in form and principle, and might have been given with propriety. But as it relates simply to the weight of evidence, and the jury were correctly advised as to the doctrine of reasonable doubt, the refusal of this instruction cannot be ground for new trial.''

The record in that case shows that the tendered instruction was as follows: ''That, if the proof of her guilt rests on circumstantial evidence, unless the circumstances be such as to produce, in the minds of the jury, a moral certainty of her guilt, and of such a nature as not to be reasonably accounted for on the supposition of her innocence, but perfectly reconcilable with the supposition of her guilt, they ought not to convict the prisoner.''

The jury in the case at bar, as in the Solander case, were told in an instruction given that a conviction might be had only if they were satisfied of the defendant's guilt beyond a reasonable doubt. The tendered instruction in each case concerned only the matter of the weight to be

given such evidence and as such matters as inconsistencies in the testimony both direct and circumstantial are almost without exception fully called to the attention of the jury by the argument of counsel we think that nondirection in such matter is not ground to set aside a verdict, where, as here, it appears from the record that the circumstances relied upon by the prosecution are consistent with the theory of guilt. Whether the hypothesis of innocence is a reasonable one is for the jury. In any case in which such an instruction might be given, it would be proper only under circumstances in which reasonable men might arrive at different conclusions as to whether the hypothesis of innocence is a reasonable one, for only in such a case would it be proper to submit the case to the jury at all. We think there was sufficient evidence to authorize a submission of this case to the jury and that the mere nondirection on the weight of the evidence does not require a reversal.

 Finally we think it was not error to admit the testimony of Childers as to conversations with the defendants after the consummation of the assault. Crimes are not committed either by an individual acting alone or in cooperation with others with the expectation of assuming responsibility for the unlawful act and paying the penalty. Least of all might it be suspected that a crime committed by two or more as the objective of a conspiracy which in its very nature involves premeditation does not involve as part of the original conspiracy or in any event often give rise to a new conspiracy to avoid its consequences. Apropos of such a situation this court in *Kolkman v. People, supra,* quoted the following with approval: " 'The common design of a criminal enterprise may extend, however, as appellant concedes, beyond the point of the commission of the act constituting the crime for which the alleged conspirator is on trial. * * * The reasonable inference to be drawn from the foregoing evidence is that all of these subsequent acts were consummated in the execution of a scheme to evade

arrest and escape punishment, and, therefore, under the rule of the authorities cited, the trial court was justified, we think, in receiving the evidence in order that the jury might determine whether or not the original conspiracy extended up to and included the scheme to escape, and, if so, whether the act of the Broses in registering under an assumed name was in pursuance thereof.' *People v. Lorraine,* 90 Cal. App. 317, 327, 265 Pac. 893, 897.''

Whether the original conspiracy in this case extended so far as to include continued cooperation to escape the penalty or whether a new conspiracy to effect this end was formed we think may be established by the acts of the parties subsequent to the accomplishment of the crime that was the direct objective of the original conspiracy, and their admissions, and even denials, of what they subsequently did are competent when they tend to prove such continued cooperation. Evidence that Clyde Smaldone went to Pueblo, leaving about the time of the alleged commission of the crime; that Stephens was in his room with two witnesses—from past and present relationship clearly friendly—who could alibi him as to any personal participation in the overt act; that he was expecting a call from Clyde Smaldone concerning—as he claimed—the sale of an ice box and received such a call as he claims from Eugene Smaldone who was identified as being at the actual scene of the assault within the hour; the unlikelihood of Eugene concerning himself with such a matter immediately after failing to successfully carry out a crime of such moment, the immediate conference of two of the three defendants after the telephone call, the denial of Clyde that any ice box deal had been discussed the afternoon before as claimed by Stephens and by Eugene Smaldone; the inconsistencies and repudiated statements made by Stephens in the same conversation; all tending to show action in concert concerning an alleged legitimate deal was competent for the jury to consider on the question of whether the alleged deal was legitimate in fact or whether the conspiracy continued for the purpose of con-

cealing the participation of each of the defendants in the conspiracy to kill and the assault in furtherance thereof. If such original conspiracy comprehended escape from penalty and cooperation to effect that end, it was still continuing and unconsummated, when the statements to which Childers testified were made, and under the well recognized rule that after the conspiracy is formed the acts and declarations of one of the conspirators during its consummation are admissible against all, the testimony of Childers was properly admitted. Section 94, volume 3, Greenleaf on Evidence (16th ed.), relating to the declarations and acts of coconspirators is as follows: "The principle on which the acts and declarations of other conspirators, and acts done at different times, are admitted in evidence against the persons prosecuted, is, that, by the act of conspiring together, the conspirators have jointly assumed to themselves, as a body, the attribute of individuality, so far as regards the prosecution of the common design; thus rendering whatever is done or said by any one in furtherance of that design, a part of the res gestae, and therefore the act of all. It is the same principle of identity with each other that governs in regard to the acts and admissions of agents when offered in evidence against their principals, and of partners, as against the partnership, which has already been considered. And here, also, as in those cases, the evidence of what was said and done by the other conspirators must be limited to their acts and declarations made and done while the conspiracy was pending, and in furtherance of the design; what was said or done by them before or afterwards not being within the principle of admissibility."

We are of the opinion that the evidence was sufficient as to all of the defendants to authorize a submission of the cause to the jury and that no error on the trial is shown which would necessitate the granting of a new trial. Accordingly the judgment is affirmed.

Mr. Chief Justice Burke, Mr. Justice Bakke and Mr. Justice Knous concur.

Mr. Justice Hilliard and Mr. Justice Francis E. Bouck dissent.

Mr. Justice Holland not participating.

Mr. Justice Hilliard dissenting.

It appears that for several years both Barnes, the prosecuting witness, and Stephens, one of the plaintiffs in error, have been professional operating gamblers; that at times jointly, at other times separately, and at still other times in conjunction with others, they conducted a gambling place in Douglas county, called Blakeland Inn; that plaintiffs in error Smaldones, never interested otherwise, were employed there from time to time; that in June, 1936, the place was closed by district court decree, and Barnes, Stephens and another were enjoined from conducting gambling in Douglas county; that subsequent thereto, and notwithstanding, Barnes did open and operate a gambling place in the same county, called Cottonwood Club; that November 9, 1936, as was testified here, but in relation to which no formal charge was ever preferred, that club was robbed of a safe and contents, $1,600, and that the Smaldones, but not Stephens, participated in the alleged robbery; that following the robbery the authorities closed the place; that December 4, 1936, Barnes called on Stephens and suggested reopening Cottonwood and inquired whether Stephens would object; that, as Barnes testified, Stephens evinced a willingness to that end, provided he were given a "cut" of one-third, which Barnes regarded as too great a share, and offered one-fifth; that neither being willing to yield, Barnes stated he would open Cottonwood on his own account, to which Stephens replied, as Barnes testified, that if he did he would not live a week, Stephens version being that Barnes invited him to join with Barnes and

another in reopening Cottonwood, "the three of us to go in three ways," but that he declined to have part in it because he was under injunctive order to refrain from gambling in Douglas county, and denied that he made threats against Barnes; that December 8, 1936, occurred the incident out of which this prosecution grew. Barnes had not reopened Cottonwood.

On the other hand, it does not appear that from June, 1936, when Blakeland was injunctively closed, to December 8, 1936, the date of the injury to Barnes, any relationship whatever existed between Stephens and the Smaldones, or that they were in communication directly or indirectly. There was no evidence that prior to December 4, 1936, when at his own instance Barnes called on Stephens to discuss reopening Cottonwood, their relations were ever other than friendly.

The first point that claims my attention is that the trial court erred in admitting testimony of the alleged robbery at the Cottonwood Club. It is to be remembered that the crime charged here has to do with "Offenses against the person," 2 '35 C. S. A. chapter 48, article 4, sections 30-80, while the crime involved in the Cottonwood Club theft comes within the statutory definition. "Offenses relating to property." 2 '35 C. S. A. chapter 48, article 6, subdivision 1, §§84-112. Plaintiffs in error severally objected to the evidence, but upon assurance from the prosecutor that it would be shown that they had part in the robbery—indicative of motive, as said—the court overruled the objection, but remarked that if the evidence did not so disclose and indicate, that it would be stricken. One witness did testify that the Smaldones engaged in the robbery, but there was no evidence that Stephens was in any way connected with the affair. Indeed, the court opinion here says the prosecution "failed" to connect Stephens with the robbery incident. In addition to objecting to the evidence in the first instance, plaintiffs in error at the close of the people's case, as well as at the conclusion of all testimony, each by his counsel, moved to

strike the claimed offending evidence and for an instruction to the jury to disregard it. Likewise, they emphasized their contention by requested instructions. The court ruled adversely.

. I think there was grave error. The charge being tried and the claimed robbery, not only are inherently different and independent crimes, as the decisions say, but are so catalogued by statute. "The general rule is that evidence of other independent crimes is not admissible." *Cargill v. People,* 73 Colo. 218, 214 Pac. 387. In *Jaynes v. People,* 44 Colo. 535, 99 Pac. 325, 16 Ann. Cas. 787, cited with approval in the Cargill case, we said that, "The reason for the rule is that no person shall be convicted of an offense by proving that he is guilty of another. Evidence of this character," we further emphasized, "tends to create a prejudice in the minds of the jury against the accused; multiplies the issues, and may confuse and mislead the jury." See, also, *Warford v. People,* 43 Colo. 107, 96 Pac. 556; *Webb v. People,* 97 Colo. 262, 49 P. (2d) 381; *Munfrada v. People,* 99 Colo. 80, 60 P. (2d) 223; *Smith v. People,* 100 Colo. 332, 67 P. (2d) 498. It is asserted that the evidence was admissible to prove motive and intent of plaintiffs in error, "since," as urged by the attorney general, "it is established in this case that the motive and intent of these defendants was to monopolize the gambling racket in and around Denver." The vice of that contention is that nothing of the kind was established. There was no testimony to that effect. It is true that plaintiffs in error and Barnes had to do with gambling at Blakeland—the Smaldones only as employed men, but after that establishment was closed by court order in June, 1936, nothing appears to show that plaintiffs in error, or any of them, engaged or attempted to engage in any form of gambling. Stephens was personally enjoined from gambling and there was no evidence that he did anything in violation of the decree. He did not set up a gambling establishment for himself or in conjunc-

tion with others in Douglas county or elsewhere, nor did he do aught to prevent others from engaging in any activity of that nature. As to the Smaldones, there is nothing to indicate that they at any time or place, were operating gamblers, or that they had, assumed to have, or were thought to have, any power of control in that field. Assuming there was a robbery at Cottonwood—Barnes gambling establishment—and that the Smaldones had part in it, neither of which was established or attempted to be established by formal judicial inquiry (all agree— even this court—that Stephens was not shown to have been involved in it), what purpose other than the gain immediately and directly to be attained, as the result of the robbery, the record considered, could have motivated the Smaldones? By all the books, the testimony was not competent to establish motive for a homicidal attempt a month thereafter. Reception of the testimony, as well as the court's disposition of the point thereafter, only served to create a "prejudice in the minds of the jury against the accused," the Smaldones in particular, Stephens generally. As to the latter there is the additional favoring fact that it is not now claimed (although, as stated in the court opinion, the prosecutor hoped to establish it) he had part in, was cognizant of, or condoned the alleged robbery. "In all the appellate courts, at the present day," says the Supreme Court of Washington, "evidence that the defendant has been guilty of a separate and distinct crime from that for which he is being tried, when offered for the purpose of aiding the conviction of the defendant, is held inadmissible, and reversible error when admitted over proper objections.

"The rule is founded in reason. The defendant comes to the trial prepared to meet only the crime with which he is accused, and he cannot from the nature of things, be prepared to defend against other crimes that may be charged against him. Moreover, it is not the policy of the law to convict a man of one crime by showing that he

has, at some time, been guilty of another. * * * its inevitable effect is to prejudice the minds of the jury against him, causing them to find him guilty of the crime charged on doubtful evidence, or evidence that would not otherwise produce a conviction. It violates, also, another well-settled rule of criminal jurisprudence, namely, it permits the state to attack the character of the defendant when he does not himself put his character in issue." *State v. Eder*, 36 Wash. 482, 78 Pac. 1023. Clearly, as I conceive, the court should have made clear to the jury that the offending evidence was not to be considered. Its power to that end was exhaustively invoked by diligent and capable counsel.

I am not unmindful of the exceptions to the rule, "as where the evidence of another offense tends to prove some element of the one for which the accused is being tried, or the motive for committing the acts which it is claimed constitute the offense for which he is on trial, as where such independent offenses, in connection with the one for which he is being tried, are committed by the accused for some particular purpose which he intends to accomplish." *Jaynes v. People, supra,* "When such testimony is received the trial judge should then limit it to the purpose for which it is admitted. * * * These precautions should be observed, because of the fact, as above indicated, that such evidence tends to create a prejudice in the minds of the jury." Id. See, also, *Warford v. People, supra.* "As a general rule, the evidence of other crimes in criminal cases is admitted to establish or strengthen some particular element or ingredient of the crime for which the accused is being tried, and in such case it is the duty of the trial court to instruct the jury to consider the evidence as to the extraneous crime, only for the particular purpose for which it was received and in some cases it is decided this is so, even though there be no request on the part of the accused for such instruction, and no exception is taken at the trial

to the omission or refusal to give it." 62 L. R. A. p. 357. Evidence concerning the Cottonwood Club incident, objected to at every stage of the proceedings, was permitted to go to the jury precisely as if it were direct evidence of guilt of defendants of the crime charged. I cannot regard the procedure adopted other than as seriously prejudicial.

On facts developed through deposition or otherwise, by the prosecution before trial, it appeared there would be evidence of the Cottonwood Club incident, and that the Smaldones, but not Stephens, had part in it; that there would be evidence that Eugene Smaldone was seen loitering about the Barnes automobile shortly before the explosion which injured him; while as to Clyde Smaldone and Stephens there would be no such evidence. Based thereon, Stephens and Clyde Smaldone, by motions adequate in substance and form, individually sought separate trials and suffered denial, I think admission of evidence of the Cottonwood Club robbery, incompetent as to Stephens, was prejudicial to him, and that is the test. *Kolkman v. People,* 89 Colo. 8, 300 Pac. 575. Likewise as to the evidence of what Eugene Smaldone was doing just before the explosion. It was prejudicial to Clyde Smaldone and Stephens. I think there should have been order of severance as to each of the movants.

In the district attorney's closing argument he said: "They have said there is no evidence here against these defendants. I point out to you that the case against defendant O'Hara [O'Hara was included in the information] was dismissed on a directed verdict by the court. If there had not been a prima facie case made as to these other defendants they would not be here." One of counsel for defendants objected to the quoted remarks of the district attorney, saying: "If your Honor please, I dislike very much to interrupt counsel in his argument, but that is a highly prejudicial remark and I ask that the jury be instructed to disregard it." The court: "If there was not a prima facie case, it probably would not be submitted

to the jury." The prosecutor's comment was highly improper, as I think, and the court should have admonished the jury to that effect. Instead, the court suggested its approval in unmistakable language, and, as said by the Supreme Court of North Carolina, "By suffering the jury to consider it, his Honor added to it the weight of his authority, and thereby suffered them to be misled." *State v. Freeman,* 49 N. C. (IV Jones' Law) 5. There never comes a time in a criminal trial to a jury when the court may say to the jury, the accused is guilty. The expression "prima facie" (presumptive fact) is not pertinent in such a trial. Where at the conclusion of the people's case in a prosecution against Jones and Smith each moves for a directed verdict of not guilty, the court may grant Jones' motion and deny that of Smith, but it may not then, or ever, intimate to the jury its estimate of the probative force of the evidence as of any stage of presentation, in its application to Smith. If in the situation I have instanced Smith offered no evidence, still the entire issue would have been for the jury. In such circumstances, I venture to suggest, the court would neither be permitted to say for itself, nor be sustained in allowing the prosecutor to say in its behalf, that at the close of the people's case the guilt of the accused had been established. It will make for clarity of thought to keep constantly in view the issue in a criminal trial. The defense, always and ever, is "Not Guilty." "It is not incumbent upon the defendant in a criminal case," said our late distinguished Chief Justice Campbell, "either by his own evidence or that of the people, or both combined, to prove anything to the satisfaction of the jury. It is sufficient * * * if the defendant, by any evidence in the case, succeeds in raising a reasonable doubt in the minds of the jury of the truth of any essential element of the charge made against him." *Zipperian v. People,* 33 Colo. 134, 79 Pac. 1018. See, also, *McBride v. People,* 60 Colo. 435, 153 Pac. 751. It has been held to be "error for the prosecuting attorney to state in effect that the court be-

lieves defendant guilty." 16 C. J. 908, §2257. In *Paul v. State,* 99 Ark. 558, 139 S. W. 287, a case essentially in point, the prosecuting attorney in closing argument to the jury said: "If there was not enough evidence to convict the defendant * * *, the court would not have permitted the case to go to the jury, and this warrants you in convicting him." Objection to this statement was overruled, as was a request to the court to withdraw the argument from the jury. The author of the opinion in commenting on this matter said: "The Attorney General in this case confesses error, and we think his confession of error is well taken, both on the insufficiency of the evidence to sustain the verdict and as to the argument of counsel. As to the latter he says: 'In this case the court allowed the prosecuting attorney to state that the court thought defendant guilty, and that would warrant the jury in convicting. The court, by refusing to interfere, approved and indorsed the statement of the prosecuting attorney. The court should in no manner intimate what its opinion of the facts is and if it does so it errs. The error is prejudicial, and calls for reversal.' The Attorney General is correct in this statement." The Kentucky Court of appeals, reviewing a parallel record, said: "The commonwealth attorney further stated in the argument that inasmuch as the court had sustained the motion of F. M. Ashcraft for a peremptory instruction, and had overruled the same as to E. P. Ashcraft, that he, the court, had evidently thought the defendant guilty. The defendant objected to this statement. The court overruled the objection. We think this was error. Whatever opinion the court may have had as to applicant's guilt or innocence, it was not proper for it to have been imparted to the jury, and, of course was not proper for the Commonwealth attorney to have been permitted to state the fact. It could properly not affect either the fact of defendant's guilt nor the jury's duty to themelsves to determine it." *Ashcraft v. Commonwealth,* 24 Ky. 488, 68 S. W. 847.

My belief is that plaintiffs in error did not have a fair trial. As a reviewing minister of justice I have no other concern.

MR. JUSTICE FRANCIS E. BOUCK concurs in this opinion.

The following dissenting opinion was filed March 13, 1939.

MR. JUSTICE BOCK dissenting.

I deeply regret my inability to concur in the denial of a rehearing herein. The administration of justice, of necessity, must be impersonal. A reviewing court in its rulings is not only concerned with the immediate persons affected but, more so, with a correct declaration of the legal principles involved. The guilt or innocence of defendants is solely the province of the jury, under proper rulings on the evidence and correct instructions covering the law applicable. The immediate individuals involved may be guilty of the crime charged, but our concern is more than that. What we establish as the law and proper and admissible evidence in this case extends to similar future cases. In fact, it is humanly impossible to foretell what effect the pronouncement of erroneous legal principles may have upon the liberties of men in the future. Trial courts are expected to apply the legal principles, which we announce or approve, in subsequent trials involving similar issues. We are not concerned here with mere technical errors, which a reviewing court may disregard as being nonprejudicial, but we are concerned with a fundamental right to a fair trial.

Section 16, article II, of our state Constitution states, "That in criminal prosecutions the accused shall have the right * * * to demand the nature and cause of the accusation." That, of course, means before trial, and it is to be inferred that the words, "nature and cause of the accusation" relate to the crime on which the defendant will be tried, and no other. *Fehringer v. People,* 59 Colo. 3, 9, 147 Pac. 361.

To try the accused on any offense other than the one

charged is not, under American jurisprudence, a fair trial. Consistent with this statement, and as applied to proof of other offenses than those charged, we have the general and universal rule that, "On a prosecution for a particular crime, evidence which in any manner shows or tends to show that accused has committed another crime wholly independent of that for which he is on trial, even though it is a crime of the same sort, is irrelevant and inadmissible. The rule extends to proof of an accusation of another crime, as well as to evidence of its actual commission." 16 C. J. 586-7. There are, however, exceptions to this rule, as, for instance, evidence designed to prove intent, motive and malice, or a plan or system of criminal action.

The information here charged defendants, first, with the substantive crime of assault on one Leo Barnes, with intent to kill and murder him; and second, that they conspired to and with each other to kill and murder Leo Barnes.

The people, over repeated objections by counsel for defendants, introduced evidence showing a burglary committed at Cottonwood Inn in Douglas county, Colorado, on November 9, 1936. No evidence was introduced connecting the defendant Stephens with this burglary. His first alleged complicity in the offenses charged was of date December 4, 1936, four days prior to the attempt to kill Barnes. There was evidence that the other defendants participated in the burglary, but the evidence concerning it was clearly inadmissible as to him, although it was admissible to show motive on the part of the Smaldones.

"Evidence which shows or tends to show the commission of other offenses by accused * * * should be carefully restricted." 16 C. J. 587. We said in *Jaynes v. People,* 44 Colo. 535, 544, 99 Pac. 325: "When such testimony is received the trial judge should then limit it to the purpose for which it is admitted. Perhaps we have never determined that a failure to so limit it when not

requested by the defendant is reversible error, but we have intimated in *Warford v. The People, supra* [43 Colo. 107], that this course should be pursued by trial courts.''

Although repeatedly requested by counsel for the defendants, at no time was this evidence concerning the burglary limited to the purpose for which it was ostensibly admitted. The trial court at one time stated that it was ''not going to give any directions about the effects of this testimony or about whom it applies until all of the testimony is in.'' And later, that ''if this testimony is not connected up, the jury will be properly instructed on that.'' This the court, although requested, failed to do. Nor did the court, although requested, instruct the jury that in so far as the defendant Stephens is concerned, the burglary evidence should be entirely disregarded. This was grevious error and highly prejudicial. At no time did the trial court instruct or advise the jury as to the effect and purpose of the testimony concerning the burglary.

The majority opinion seems to imply that since Stephens participated with the other defendants in an illegal project of gambling, in which he demanded from the complaining witness Barnes cuts in the illicit gains, that the evidence as to the burglary also was admissible against him, if such illegal actions throw light on his motives or on those of his codefendants in committing the crimes charged. The fallacy of this position is, first, that there was no evidence of participation in any illegal gambling projects by Stephens, either at the time of the Cottonwood Inn burglary or at the time of the commission of the crimes charged on December 8, 1936, or between those dates; and second, assuming that there was, it was simply proof of another offense than the one charged, which the trial court should properly have restricted to its purposes and effect, but which it failed to do. Under no previously known rules of evidence was testimony of

the burglary admissible as to Stephens under the charges and the facts and circumstances here involved.

The record shows other prejudicial errors, to which reference is made by the Chief Justice in his dissenting opinion announced in the original disposition of this case. Repetition is needless.

I am of the opinion that rehearing should be granted.

MR. CHIEF JUSTICE HILLIARD and MR. JUSTICE FRANCIS E. BOUCK concur in this dissent.