**Lisl AUMAN, Petitioner,**

v.

**The PEOPLE of the State of Colorado, Respondent.**

**No. 02SC885.**

Supreme Court of Colorado, En Banc.

March 28, 2005.

Rehearing Denied April 18, 2005.

David S. Kaplan, Colorado State Public Defender, Kathleen A. Lord, Chief Appellate Deputy State Public Defender, Denver, for Petitioner.

John W. Suthers, Attorney General, Paul Koehler, Assistant Attorney General, Appellate Division, Criminal Justice Section, Denver, for Respondent.

Haddon, Morgan, Mueller, Jordan, Mackey & Foreman, P.C., Norman R. Mueller, Rachel Bellis, Denver, for Amicus Curiae National Association of Criminal Defense Lawyers.

Colorado District Attorneys' Council, Peter A. Weir, Former Executive Director, Denver, Steven L. Bernard, Assistant District Attorney, Nineteenth, Judicial District, Brighton, for Amicus Curiae Colorado District Attorneys' Council.

BENDER, Justice.

## I. INTRODUCTION

In this appeal, we review the court of appeals' decision in *People v. Auman*, 67 P.3d 741 (Colo.App.2002), which affirmed Lisl Auman's convictions for first degree felony murder and second degree burglary.[1] We agree with the court of appeals that, as a matter of law, Auman's arrest did not terminate her liability for felony murder and that whether a co-participant's arrest terminates his or her immediate flight from the commission of the predicate felony while another participant remains in flight is a question for the jury to decide.

However, proof of the predicate crime is just as important an element of the crime of felony murder as is proof that death occurred in immediate flight. Here, the predicate felony was second degree burglary, which requires that the defendant intend to commit the crime of theft when unlawful entry occurs. Hence, we also address whether an error in the theft instruction requires reversal of Auman's conviction for second degree burglary and, if so, then necessarily of her conviction for felony murder as well.

Our review of the record leads us to conclude that the erroneous theft instruction may have deprived Auman of her right to a full and fair jury consideration of her defense to burglary. Hence, we reverse her second degree burglary conviction. Because Auman's felony-murder conviction was based upon the jury's finding that she committed second degree burglary, we similarly reverse that conviction and remand for a new trial.

In November 1997, Auman and a few others moved her belongings out of a room that she had been renting at an eleven-bedroom lodge (the Lodge) in the Denver foothills. In the process of moving her things out, the evidence supported a conclusion that Auman and the others with her broke the padlock to

---

1. Auman's conviction of conspiracy to commit first degree burglary is not the subject of her appeal to this court, and we therefore do not address the court of appeals' decision to affirm that conviction.

the room of another tenant, Shawn Cheever, and removed some of his belongings as well as some of Auman's things which were also in Cheever's room.

According to the evidence presented, after loading the items into two cars they had driven to the Lodge, the group drove away in their separate cars. When the police attempted to stop the car that Auman was riding in, Matthew Jaehnig, the driver of that car, led law enforcement officers on a high-speed chase into Denver. During this chase, and while Auman held the steering wheel, Jaehnig shot at an officer's car with an assault rifle. He then drove to the apartment complex to which Auman was moving.

Upon reaching the apartment complex, police officers saw Auman and Jaehnig run into a small alcove of the complex, and, shortly thereafter, Auman surrendered to police. She had been under arrest for approximately five minutes when a Denver police officer, Bruce VanderJagt, who was searching for Jaehnig, looked around the corner of the alcove and was shot and killed by Jaehnig. In the period between her arrest and the fatal shooting, Auman did not tell police, despite their repeated questions, that she knew that Jaehnig was probably still cornered in the alcove and that he was armed with an assault rifle.

Under our relevant statute and established case law, each felony-murder case involving immediate flight, in which a death is caused after the arrest of a co-participant, must be decided according to its unique set of circumstances. Unless the connection between the resulting death and the co-participant's arrest, the predicate felony, or immediate flight is so attenuated that the trial court must order the entry of a judgment of acquittal under Colorado Rule of Criminal Procedure 29, the trial court shall submit this issue for decision by the jury.[2] We hold that, as a matter of law, arrest, by itself, does not terminate a co-participant's liability for felo-

ny murder when death occurs at the hands of another participant who remains in flight.

A conviction for the crime of felony murder requires that a death occur in the commission of a specifically enumerated felony. Here, Auman's conviction for second degree burglary served as the predicate felony for her felony-murder conviction. Second degree burglary requires that a defendant possess the intent to commit a crime when he or she breaks an entrance into a building or occupied structure. The People charged that Auman intended to commit the crime of theft when she, and the others with her, broke the lock and entered Cheever's room. Hence, the jury's understanding of the definition of theft formed an essential element of Auman's conviction for felony murder.

However, the theft instruction omitted a required element of theft. The element which was omitted was the requirement that the defendant acted "knowingly" without authorization in taking the other person's property. Based on this omission, the court of appeals determined that the theft instruction was erroneous. *Auman*, 67 P.3d at 760. The People agree that the instruction was improper. If a proper theft instruction had been incorporated into the instruction on second degree burglary, the jury, to convict Auman of burglary, would have been required to find that she intended to steal (to knowingly take Cheever's property without his authorization) when she unlawfully entered Cheever's room.

Auman admitted she entered Cheever's room unlawfully but claimed she did so only to retrieve her property and contended that the taking of Cheever's property occurred by the others involved. In making this admission, Auman conceded that she committed the crime of criminal trespass, which is a lesser included crime of second degree burglary and is not burglary. The erroneous instruction here, however, allowed the jury to convict Auman of burglary without considering her defense to that crime. According to

2. Although not raised before us on appeal, we note that the court of appeals upheld the trial court's denial of Auman's motion for judgment of acquittal, concluding that the People had presented sufficient evidence to warrant the jury's

consideration of whether Auman's arrest terminated her liability for felony murder. *Auman*, 67 P.3d at 756–57. We agree with that court's ruling on this issue.

the terms of the improper instruction, it was irrelevant to the jury's decision to convict her of burglary whether Auman intended to take only those items which she believed she was authorized to take when she entered Cheever's room.

Auman's defense to burglary centered upon the claim that she had not formed the intent to steal when the unlawful entry occurred. The evidence, when viewed in its entirety, was not so overwhelming that she formed this required intent to sufficiently cure the instructional error. Thus, we conclude that this erroneous instruction substantially affected Auman's right to a full and fair jury consideration of her defense to burglary. It is reasonably possible that the error contributed to Auman's burglary conviction such that the fundamental fairness of her trial is called into question and serious doubt is cast upon the reliability of the jury verdict.

Hence, we reverse the judgment of the court of appeals affirming those convictions which were based upon the erroneous theft instruction: second degree burglary and felony murder. We remand this case to the court of appeals to be returned to the trial court for a new trial on these charges.

## II. FACTS AND PROCEEDINGS BELOW

Auman was convicted of felony murder for her role in an alleged burglary which resulted in the shooting death of a Denver police officer, Bruce VanderJagt, on November 12, 1997.

Auman had rented a room at an eleven-bedroom lodge (the Lodge) in Buffalo Creek, Colorado and had dated another Lodge tenant, Shawn Cheever, while she was there. Approximately one week before the alleged burglary, Auman learned that Cheever no longer wanted to continue his relationship with her.

Auman made plans to move out of the Lodge and to move in with her friend, Demetria Soriano, at Soriano's apartment in southeast Denver. On the evening before the alleged burglary, Auman and Soriano were at the apartment with Soriano's live-in boyfriend, Dion Gerze, and Gerze's friends, Matthew Jaehnig and Stephen Duprey. At Auman's request, the group agreed to help her retrieve her belongings, some of which were in Cheever's room, from the Lodge. At that same time, Auman indicated to the group that Cheever had mistreated her.

In a post-arrest interview with police, Auman stated that she had wanted the men to come along as "muscle" in case a problem with Cheever were to arise when she tried to get her things. She admitted she was aware that Gerze and Jaehnig carried guns, and she had asked Gerze not to kill Cheever. In response, Gerze stated he could not promise anything.

At approximately noon on the day of the alleged burglary, the group headed to the Lodge in two cars. Auman rode with Jaehnig in a Trans Am, which, according to Detective Rick Schneider's testimony, was stolen. The others followed in Soriano's car. Prosecution photos showed that Jaehnig was carrying a shotgun and two assault rifles in his car, which were visible from the passenger seat. Auman told police she did not notice the assault rifle until Jaehnig took it out during the later police chase into Denver.

Upon arriving at the Lodge, Auman and Soriano began moving Auman's things out of her room and loading them into the cars. Cheever was at work during this time, and, at some point, the padlock securing his room was cut with bolt cutters. Auman, Gerze, and Duprey then removed several items from Cheever's room, including some of Cheever's property. Tenants at the Lodge saw Auman and the others as they were carrying items from Cheever's room. One of the tenants openly recorded the license plate numbers of the cars.

While the others were making trips in and out of the Lodge, Jaehnig stayed at his car. In response to a question by police as to whether Jaehnig had acted as a "lookout," Auman stated, "I think so." The evidence showed that Jaehnig provided the bolt cutters which were used to cut the padlock on the door to Cheever's room and also helped load items into his car.

After they finished loading the cars, Auman and Jaehnig drove toward Denver in the

Trans Am. Although the others had left before them, Gerze, Duprey, and Soriano returned to the Lodge in their car shortly thereafter but then left the Lodge in the opposite direction of Auman and Jaehnig.

Responding to a 911 burglary-in-progress call from Lodge residents, two sheriff's deputies in separate vehicles began to follow the Trans Am. When the deputies turned on their emergency lights and sirens, Jaehnig sped off, and a high-speed chase ensued. Auman told police that she thought Jaehnig was fleeing from the deputies because he was "wanted."

As the chase proceeded through Denver, the Trans Am came to a complete stop two separate times. Auman did not get out of the car either time. She later told police that the second time the car stopped, which lasted for up to thirty seconds, she considered getting out, but Jaehnig told her, "[D]on't even think about it."

At one point during the chase, Auman held the steering wheel while Jaehnig leaned out of the car window and shot at one of the deputies with an assault rifle. Auman told police that Jaehnig had asked her to take the wheel and that she had steered so that they did not lose control of the car.

When the Trans Am reached Soriano's apartment complex, Auman and Jaehnig ran into an alcove outside Soriano's apartment because they did not have keys to unlock Soriano's door. The alcove was essentially a dead end. They would have been plainly visible to pursuing police officers had they fled from the small alcove area. Police officers had seen Auman and Jaehnig standing at the door of Soriano's apartment and had seen them head to the alcove, but, because of their viewing angle, they could not determine whether the pair could have escaped, undetected, from the alcove. Police officers repeatedly ordered the pair to surrender, and, shortly thereafter, Auman surrendered to the officers, who forced her to the ground and handcuffed her before placing her in a police car.

Immediately after Auman was arrested, Officer Jason Brake repeatedly asked her about Jaehnig's whereabouts. When Auman gave no reply, Brake became adamant, saying, "Where the fuck is he? We're not fucking around. Where the fuck is he?" Brake stated that Auman "glared" at him and responded, "I don't know what you're talking about." Auman gave the same response to another officer's repeated pleas regarding Jaehnig's whereabouts.

The officers, not realizing that Jaehnig was essentially cornered in the alcove, ran around the complex to see if he had fled from the back, but they saw neither Jaehnig nor footprints in the snow. Officer VanderJagt then volunteered to see whether Jaehnig was in the alcove. When he peered around the corner of the alcove, Jaehnig shot Officer VanderJagt in the head at point-blank range, killing him instantly. Jaehnig then spent all of his ammunition in a gun battle with officers before killing himself with Officer VanderJagt's gun. Officer VanderJagt's death occurred approximately five minutes after Auman's arrest.

Later that day at police headquarters, Auman consented to two videotaped interviews, which were played to the jury at her trial. During these interviews, Auman admitted that the group took property belonging to Cheever. Police later found several items taken from Cheever's room in the two cars, including: a snowboard, two camcorders, a tripod, two stereo speakers, an amplifier, a Sony Discman, and several CDs. Auman also admitted that she was aware when she was arrested that Jaehnig was still carrying the assault rifle he had used to shoot at the sheriff's deputy and that he probably could not have escaped from the alcove without being seen by police.

Auman was charged with several criminal offenses, including first degree felony murder, attempted first degree murder, first degree assault, menacing, first degree burglary, and conspiracy to commit first degree burglary. At the request of Auman's counsel, and as lesser included offenses to the charge of first degree burglary, the court instructed the jury on second degree burglary and first degree criminal trespass.

At the preliminary hearing, the trial court found that the burglary, flight, and shooting were connected by a "continuing sequence of

events." Relying on our holding in *People v. McCrary*, 190 Colo. 538, 549 P.2d 1320 (1976), and, after viewing the facts in the light most favorable to the prosecution, the court concluded, as a matter of law, that immediate flight had not terminated upon Auman's arrest and that the question of whether she was guilty of felony murder could thus be submitted to the jury.

At trial, following the prosecution's presentation of evidence, Auman's counsel called six witnesses. One witness testified that Jaehnig looked "evil" and that Auman did not have an opportunity to get out of the car at the intersection. Three of Auman's friends testified that she was a nonviolent person. A forensic toxicologist testified that Jaehnig's autopsy revealed high levels of methamphetamines which would have caused him to act aggressively and recklessly.

In closing, the People argued that Auman committed felony murder because she was guilty of burglary and because Officer VanderJagt's death was caused by Jaehnig in immediate flight from that burglary. The People argued that Auman's arrest did not terminate her liability for felony murder while Jaehnig's immediate flight continued and while she lied to and withheld information from police. The People also argued that Auman did not meet the statutory affirmative defense to felony murder because, among other things, she did not immediately disengage herself from immediate flight upon having reasonable grounds to believe that Jaehnig was armed or dangerous.

In response, Auman's counsel argued that she had not committed felony murder under several different theories, including: (1) that immediate flight had terminated upon Auman's arrest, thereby terminating her liability for felony murder; and (2) that she did

not commit the predicate felony of burglary. Auman's counsel also argued that the prosecution did not disprove the statutory affirmative defense to felony murder.

The trial court submitted a jury instruction which tracked the language of the felony-murder statute and included the immediate flight element. The court declined to submit supplemental instructions tendered by the People and Auman.[3] The People's instruction tracked the language of this court's decision in *McCrary*, stating that "[t]here can be no exact measure of the time or distance which is dispositive of whether Felony–Murder exists." *See* 190 Colo. at 553, 549 P.2d at 1332. Auman's tendered instruction defined immediate flight and the factors that could terminate flight.

The jury acquitted Auman of first degree burglary[4] but found her guilty of first degree felony murder, second degree burglary, conspiracy to commit first degree burglary and menacing.

Auman appealed her convictions to the court of appeals. She made numerous arguments, asserting that the trial court had committed reversible error in improperly instructing the jury on the required elements of second degree burglary and theft. The court rejected each of these arguments, finding that the alleged errors did not contribute to the jury's verdict on the second degree burglary count. *Auman*, 67 P.3d at 759–761.

With regard to Auman's appeal of her felony-murder conviction, the court of appeals held that, as a matter of law, arrest does not terminate a co-participant's liability for felony murder while another participant remains in flight. *Id.* at 751–54. The court thus held that the trial court properly left to the jury the issue of whether Auman's arrest

---

3. However, the trial court allowed both Auman and the People to argue to the jury the effect of Auman's arrest on immediate flight. In closing, Auman's counsel argued that she had been under arrest for five minutes when the shooting occurred and that the arrest had terminated her immediate flight. The People argued that even though Auman was under arrest at the time of the shooting, immediate flight does not terminate under Colorado's felony-murder statute while another participant continues in flight from the scene of the underlying felony.

4. The jury also acquitted Auman on the charge of attempted first degree murder. Pleading the affirmative defense of duress, Auman's counsel argued that she was not a complicitor in this crime even though she held the steering wheel while Jaehnig shot at the pursuing sheriff's deputy. The jury also acquitted Auman on the charge of first degree assault.

terminated immediate flight. *Id.* at 754. In addition, the court held that the trial court's failure to properly instruct the jury on the immediate flight element of felony murder did not constitute plain error because the instruction followed the recommended language of the Colorado Criminal Jury Instruction on felony murder. *See* CJI–Crim. 9:02. The court held that the instruction, as worded, "sufficiently required that the People prove a causal connection beyond a reasonable doubt." *Auman,* 67 P.3d at 759. The court also rejected Auman's assertion that the trial court had committed reversible error in failing to define "immediate flight." *Id.* at 755.

Auman now appeals to this court, arguing that arrest, as a matter of law, terminates liability under Colorado's felony-murder statute. She also asserts that the trial court committed reversible error in improperly instructing the jury on felony murder, second degree burglary, and theft.[5]

## III. WHETHER AUMAN'S ARREST TERMINATED HER LIABILITY FOR FELONY MURDER

### A. The Felony–Murder Statute: Four Requirements

On its face, Colorado's felony-murder statute is broad in scope. The words of the statute provide that if a person commits a specifically enumerated felony and an innocent party dies during that felony or during immediate flight from that felony, then that person commits felony murder:

> A person commits the crime of murder in the first degree if: ... [a]cting either alone or with one or more persons, he [or she] commits or attempts to commit ... burglary ... and, in the course of or in furtherance of the crime that he [or she] is committing or attempting to commit, or of immediate flight therefrom, the death of a person, other than one of the participants, is caused by anyone.

§ 18–3–102(1)(b), 6 C.R.S. (1999).

■ Pursuant to the terms of this statute, it does not matter that the defendant had no intent to kill or that the defendant did not cause the killing. Liability arises from the defendant's participation in, and intent to commit, one of the specifically named, or predicate, felonies. According to the felony-murder doctrine, the intent to kill is imputed from the participant's intent to commit the predicate felony. *See Whitman v. People,* 161 Colo. 110, 114–15, 420 P.2d 416, 418 (1966) ("The turpitude of the felonious act is deemed to supply the element of deliberation or design to effect death."). Our felony-murder statute provides severe penalties for those who participate in specifically enumerated felonies involving a risk of death when death is caused during a felony or in immediate flight from that felony.[6]

■ Under this statute, a defendant who commits a predicate felony may be liable when death occurs during either of two events, namely: (1) "in the course of or in furtherance of the crime that [the defendant] is committing or attempting to commit;" or, (2) "in the course of or in furtherance ... of immediate flight therefrom."[7] § 18–3–

---

5. We initially granted certiorari review on the following issue:

> (1) Whether the court of appeals properly determined that the petitioner's arrest by police did not preclude her liability for felony murder.

After initial briefing and arguments, we requested supplemental briefing and heard arguments by both parties on the following issue as well:

> (2) If a defendant's conviction for felony murder may be premised on a co-felon causing death in the course of and in furtherance of the co-felon's immediate flight from the underlying felony, was the jury properly instructed on the elements of felony murder, including the concepts of "in furtherance of" and "immediacy"

as they relate to this case, and if not, was any error reversible?

6. The following felonies, all of which involve a risk of death, trigger liability for felony murder under the statute: arson, robbery, burglary, kidnapping, certain forms of sexual assault and sexual assault on a child, and the crime of escape. § 18–3–102(1)(b).

7. *See* § 18–3–102(1)(b) ("of immediate flight therefrom" relates back to the preceding phrase "in the course of or in furtherance of"); *accord People v. Donovan,* 53 A.D.2d 27, 34, 385 N.Y.S.2d 385 (1976) ("in the course and furtherance of immediate flight"); *N.Y. Penal Law* § 125.27(1)(a)(vii) (McKinney 2004) ("in the

102(1)(b). Here, we address only whether the death was caused in the course of or in furtherance of immediate flight from the predicate felony, which in this case was burglary.

According to the plain language of the immediate flight provision of the statute, there are four limitations on liability for felony murder when a death occurs during flight from the predicate felony.

■ First, the flight from the predicate felony must be "immediate," which requires a close temporal connection between the predicate felony, the flight, and the resulting death. *See Webster's New World College Dictionary* 713 (4th ed.1999) (defining "immediate" as "without delay" or "of the present time").

■ Second, the word "flight" limits felony-murder liability in such cases to those circumstances in which death is caused while a participant is escaping or running away from the predicate felony. *Id.* at 541 (defining "flight" as "a fleeing from ... to run away").

■ Third, the death must occur either "in the course of" or "in furtherance of" immediate flight, so that a defendant commits felony murder only if a death is caused during a participant's immediate flight or while a person is acting to promote immediate flight from the predicate felony. *See id.* at 333 (defining "in the course of" as "in the progress or process of; during"); and *id.* at 575 (defining "furtherance" as "a furthering, or helping forward; advancement; promotion").

■ Fourth, the immediate flight must be "therefrom," indicating that the flight must be from the predicate felony, as opposed to being from some other episode or event.

■ In 1971, the General Assembly added the words "immediate flight therefrom" to the statute. *See* ch. 121, sec. 1, § 40–3–102(1)(b), 1971 Colo. Sess. Laws 388, 418. When these words are read together with the initial words of the statute, which provide that one may act "either alone or with one or more persons," immediate flight terminates when a sole participant in the subject felony is subject to complete custody, or, alternatively, when all participants in a predicate felony involving more than one participant are subject to complete custody.[8]

The plain language of our statute supports the legal principle that a co-participant in a predicate felony may be liable for felony murder even after arrest while another participant remains in immediate flight. The statute deems conduct as murder when one participates in the predicate felony and a death is caused in the course of or in furtherance of "immediate flight," which, by its terms, is not limited to the flight of any particular participant. The felony-murder statute regards all participants as liable for felony murder when a person acts "with one or more persons" in the commission of a specifically enumerated felony and death is "caused by anyone" "in the course of or in furtherance ... of immediate flight" from the predicate felony. § 18–3–102(1)(b).

Just as important as what the statute says is what the statute does not say. As it is worded, the statute does not differentiate between liability for participants in the predicate felony who are in immediate flight and those who are not; nor does the statute state that some participants may be liable for a death that occurs in the course of or in furtherance of immediate flight but that others may not. The statute also does not state that if a co-participant's actual flight ends as

---

course of and furtherance of immediate flight after committing or attempting to commit [an enumerated felony]").

8. While arrest of a sole participant, or of all participants, may terminate flight for the purposes of felony-murder liability, this principle should not be confused with situations where the commission of the crime has not yet been completed when the arrest takes place. Even after the defendant's arrest, the defendant may commit felony murder when death is caused by dead-

ly force that continues or carries over from the commission of the predicate felony. *See State v. Hokenson,* 96 Idaho 283, 527 P.2d 487 (1974) (upholding felony-murder conviction where police officer was killed in explosion by bomb that robber had planted prior to being arrested); *People v. Keshner,* 304 N.Y. 968, 110 N.E.2d 892 (1953) (upholding felony-murder conviction for arsonist who was under arrest when fire killed police officer).

a result of arrest, and another participant remains in flight, that immediate flight has ended for the co-participant under arrest. Most importantly, the statute does not say that a co-participant may be liable for felony murder for only those deaths caused during that co-participant's immediate flight. We should not construe these omissions by the General Assembly as unintentional. *Zamarripa v. Q & T Food Stores, Inc.*, 929 P.2d 1332, 1339 (Colo.1997).

We next turn to the statutory affirmative defense to determine how it affects our analysis of this statutory crime. The General Assembly created an affirmative defense to felony murder that allows a defendant to avoid felony-murder prosecution if "he not only had nothing to do with the killing itself, but was unarmed and had no reason to believe that any of his confederates were armed or intended to engage in any conduct dangerous to life." § 40–3–102 cmt., 12 C.R.S. (1963) (1971 Perm. Cum.Supp.).[9] The affirmative defense also provides that if a defendant discovers that a co-participant is armed or dangerous during the commission of the crime or in flight therefrom, the defendant may obtain the benefit of this defense by immediately disengaging from either the predicate felony or the flight. *See* § 18–3–102(2)(f).

Like the plain language of the statutory offense, the affirmative defense provides no support for the theory that arrest, by itself, terminates a co-participant's liability for felony murder as a matter of law. This conclusion, however, does not mean a jury should not consider a co-participant's arrest as a factor in deciding whether the prosecution has satisfied its burden of proving that the affirmative defense does not apply.

**9.** In full, the affirmative defense to Colorado's crime of felony murder provides:

(2) It is an affirmative defense to a charge of violating subsection (1)(b) of this section [the felony-murder provisions] that the defendant:
(a) Was not the only participant in the underlying crime; and
(b) Did not commit the homicidal act or in any way solicit, request, command, importune, cause, or aid the commission thereof; and
(c) Was not armed with a deadly weapon; and
(d) Had no reasonable ground to believe that any other participant was armed with such a weapon, instrument, article, or substance; and

## B. Immediate Flight Before and After Our Present Statute

Colorado's former felony-murder statute provided that "[a]ll murder ... which is committed in the perpetration ... [of a predicate felony] ... shall be deemed murder of the first degree ...." § 40–2–3(1), 3 C.R.S. (1963). In *Bizup v. People*, 150 Colo. 214, 371 P.2d 786 (1962), a pre-code case, we interpreted this statute and held that the perpetration of the predicate felony encompasses the act of flight from that felony. In addition, in *McCrary*, another pre-code case, we upheld the defendant's conviction for felony murder even though the flight of the defendant and his co-participant was purportedly interrupted twice before the eventual killing: first, when they stopped at a bar for up to a half hour; and second, when the co-participant molested the victim. 190 Colo. at 552–53, 549 P.2d at 1331–32. In that case, we approved the jury's finding that liability continued despite these alleged interruptions. *Id.* at 553, 549 P.2d at 1332.

Under *Bizup* and *McCrary*, the concept of flight is broad. Together, these pre-code cases stand for the proposition that, as a matter of law, felony murder does not terminate where death occurs during continuous flight from the predicate felony, nor does it terminate where intervening events interrupt flight.

In interpreting the phrase "immediate flight therefrom," we have relied upon and applied *Bizup*, *McCrary*, and other pre-code cases construing the meaning of flight under our pre-code statute. *See People v. Hickam*, 684 P.2d 228, 231–32 (Colo.1984). We con-

(e) Did not engage himself in or intend to engage in and had no reasonable ground to believe that any other participant intended to engage in conduct likely to result in death or serious bodily injury; and
(f) Endeavored to disengage himself from the commission of the underlying crime or flight therefrom immediately upon having reasonable grounds to believe that another participant is armed with a deadly weapon, instrument, article, or substance, or intended to engage in conduct likely to result in death or serious bodily injury.
§ 18–3–102(2), C.R.S. (2004).

clude that the General Assembly's 1971 addition of the words "immediate flight therefrom" incorporates into our present statute the concept derived from these pre-code cases that a defendant may be liable for felony murder for a death caused either during the predicate felony or during immediate flight from that felony.

Our pre-code precedent concerning immediate flight is consistent with judicial decisions from New York interpreting that state's felony-murder statute, *N.Y. Penal Law* § 125.25(3) (McKinney 1967),[10] the statute upon which our General Assembly largely modeled section 40–3–102(1)(b).[11] *See People v. Irby*, 47 N.Y.2d 894, 419 N.Y.S.2d 477, 393 N.E.2d 472 (1979); *Donovan*, 53 A.D.2d at 33, 385 N.Y.S.2d 385. Like the Colorado General Assembly, New York's legislature added the words "immediate flight therefrom" to its statute to clarify that felony-murder liability does not terminate upon the completion of the predicate felony. *See* Practice Commentary, *N.Y. Penal Law* § 125.25 (McKinney 1967).

Further, under New York's statute, arrest does not terminate immediate flight or liability for felony murder as a matter of law. *Irby*, 419 N.Y.S.2d 477, 393 N.E.2d at 472–73. Interpreting the scope of "immediate flight therefrom," the New York Appellate Division's decision in *Donovan* paralleled our

*McCrary* holding in stating that "[t]here is no exact minute on the clock or milepost along the escape route, the passage of which terminates a crime." *Donovan*, 53 A.D.2d at 33–34, 385 N.Y.S.2d 385 (rejecting argument that the passing of 45 minutes and more than 37 miles between felony and death preclude the jury from finding that defendant was in "immediate flight").

### C. Additional Cases from Other Jurisdictions

The cases cited by Auman to support her view that, as a matter of law, arrest terminates a co-participant's liability for felony murder do not support a different reading of Colorado's felony-murder statute. These cases fall into one of two categories. First, they involve either the arrest of a sole participant or the arrest of all participants, and, as a matter of law, arrest therefore terminates liability for felony murder.[12] The same would be true under our statute as well if Auman had been the only participant, or if Auman and all of her co-participants had been arrested, and the death occurred after arrest. Second, there exists precedent from other jurisdictions where, as a matter of law, the statute in question dictates that arrest terminates liability.[13] Neither category applies to this case.

10. The relevant provisions of New York's earlier felony-murder statute and affirmative defense read as follows:

A person is guilty of murder when: ... [a]cting either alone or with one or more other persons, he commits or attempts to commit ... burglary ... and, in the course of and in furtherance of such crime or of immediate flight therefrom, he, or another participant, if there be any, causes the death of a person other than one of the participants; except that in any prosecution under this subdivision, in which the defendant was not the only participant in the underlying crime, it is an affirmative defense that the defendant:

(a) Did not commit the homicidal act or in any way solicit, request, command, importune, cause or aid the commission thereof; and

(b) Was not armed with a deadly weapon, or any instrument, article or substance readily capable of causing death or serious physical injury of a sort not ordinarily carried in public places by law-abiding persons; and

(c) Had no reasonable ground to believe that any other participant was armed with such a weapon, instrument, article or substance; and

(d) Had no reasonable ground to believe that any other participant intended to engage in conduct likely to result in death or serious physical injury.

*N.Y. Penal Law* § 125.25(3) (McKinney 1967). The language of New York's current section 125.25(3) is identical to this earlier version except that felony murder under this section is now classified as "murder in the second degree." *See N.Y. Penal Law* § 125.25(3) (McKinney 2004). *Cf. N.Y. Penal Law* § 125.27(1)(a)(vii) (McKinney 2004) (defining first degree felony murder).

11. *See also* § 40–3–102 cmt. (legislative comment on Colorado's felony-murder statute incorporates language from the 1967 Practice Commentary to New York's section 125.25).

12. *See Collier v. State*, 244 Ga. 553, 261 S.E.2d 364 (1979), *overruled on other grounds; State v. Milam*, 163 N.E.2d 416 (Ohio Ct.Com.Pl.1959).

13. *See, e.g., Coleman v. U.S.*, 295 F.2d 555 (D.C.Cir.1961).

### D. Whether Arrest Terminates Liability for Felony Murder Is a Jury Question

As discussed, Colorado modeled its felony-murder statute on New York's statute, which treats the issue of whether arrest terminates liability for felony murder as a jury question. *Irby,* 419 N.Y.S.2d 477, 393 N.E.2d at 472–73. In adopting its present felony-murder statute, New York rejected the "arbitrary," "strict," and "technical" legal rules that formerly left a judge to resolve, as a matter of law, the issue of when the commission of a felony ended. *See People v. Gladman,* 41 N.Y.2d 123, 390 N.Y.S.2d 912, 359 N.E.2d 420, 423–24 (1976); Practice Commentary, *N.Y. Penal Law* § 125.25 (McKinney 1967). Under the new statute, the scope of immediate flight is a factual question for a jury to decide because immediate flight differs according to the unique facts and circumstances of each case, such as the time and distance between the felony and the killing. *Gladman,* 390 N.Y.S.2d 912, 359 N.E.2d at 424. In addition, the statute requires a jury to decide the factual issue of whether a defendant is liable for felony murder following the defendant's arrest. *Irby,* 419 N.Y.S.2d 477, 393 N.E.2d at 472–73.

Similarly, Colorado's pre-code cases left it to the jury to decide whether flight had ended under the facts of a given case. *See, e.g., McCrary,* 190 Colo. at 553, 549 P.2d at 1332. Under *McCrary,* the jury is left with considerable discretion in deciding when flight ends. *See id.* at 553, 549 P.2d at 1331–32.

Our present felony-murder statute requires a jury to decide factual issues relating to the effect of arrest on felony-murder liability, such as whether, in spite of arrest, the temporal connection between the predicate felony, flight, and death is "immediate," and whether a death following a defendant's arrest is still "in the course of or in furtherance of" immediate flight from the predicate felony.

We hold that under our statute and precedent, each felony-murder case involving immediate flight must be decided according to its unique set of circumstances. As a matter of law, arrest, by itself, does not terminate a co-participant's liability for felony murder when a death occurs at the hands of another participant who remains in flight. Hence, whether Auman's arrest terminated her liability for felony murder was properly left to the jury.

### IV. THE TRIAL COURT'S INSTRUCTION ON FLIGHT AND THE LACK OF AN INTERVENING CAUSE INSTRUCTION

Having concluded that the trial court properly left to the jury the determination of whether Auman's arrest terminated her liability for felony murder, we next consider whether the trial court improperly instructed the jury on the offense of felony murder and, if so, whether reversible error was committed.

### A. The Trial Court's Instruction on Immediate Flight

■ The trial court followed the recommended language of the Colorado Criminal Jury Instruction on felony murder, *see* CJI–Crim. 9:02, and instructed the jury that it could hold Auman liable for felony murder if it found beyond a reasonable doubt that Officer VanderJagt's death was caused by anyone "in the course of or in the furtherance of Burglary, or in the immediate flight therefrom."

Auman contends that the error occurred in the fifth element of the felony-murder instruction:

(1) That the Defendant,

(2) in the State of Colorado, on or about November 12, 1997,

(3) acting with one or more persons,

(4) committed Burglary, and

(5) *in the course of or in the furtherance of Burglary, or in the immediate flight therefrom,*

(6) the death of Officer Bruce Vanderjagt [sic], other than one of the participants, is caused by anyone,

(7) without the affirmative defense in Instruction No. 16.

(Emphasis added.)

As noted, section 18–3–102(1)(b) provides that a person commits felony murder if a death is caused "in the course of or in furtherance of the crime that he [or she] is committing or attempting to commit, *or of immediate flight therefrom . . .*" (emphasis added). In interpreting this statute with regard to the immediate flight element, we previously held that a person commits felony murder when a co-participant causes death "*in the course of or in furtherance . . . of immediate flight* [from the predicate felony]." Auman contends that by substituting the preposition "in" for "of" in the phrase "or *in* the immediate flight therefrom,"[14] the trial court failed to connect the immediate flight element to the phrase directly preceding it and thus did not properly inform the jury that the language "in the course of or in furtherance of" also applied to the immediate flight element. If the language "in the course of or in furtherance of" had been applied to the immediate flight element by the use of the preposition "of," Auman contends that the jury would have been properly instructed that, consistent with our previous holding, a person is liable for felony murder when a death is caused "in the course of or in furtherance . . . of immediate flight."

While Auman maintains that, at the least, the trial court should have used "of" instead of "in," she asserts that the entire phrase "in *the course of or in furtherance of* immediate flight therefrom," (underlined words omitted), should have been inserted into the fifth element of the instruction.

By instructing the jury that Auman could be found guilty of felony murder if death were caused "*in* the immediate flight therefrom," Auman contends that the jury was permitted to find only a temporal, as opposed to the required causal, connection between the felony, flight, and death. Auman asserts

that the trial court should not have instructed the jury that a person commits felony murder when a death occurs "in," which connotes "during," immediate flight from a predicate felony. Rather, Auman argues that by using the word "of" from the statute, which relates back to the phrase "in the course of or in furtherance of" immediate flight therefrom, or by inserting the phrase in its entirety into the felony-murder instruction, the jury would have been required to find that the burglary, flight, and death were not just temporally, but also causally, related.

We agree with Auman that the instruction here should have tracked the precise language of the felony-murder statute; however, we disagree that the instruction constituted reversible error.[15] As submitted, the instruction's requirement that the jury find that the death occurred "in immediate flight therefrom" expressly contained three of the four limitations included in the felony-murder statute: first, it required the jury to find that the connection between the predicate felony, flight, and death was "immediate"; second, it required that a participant be in "flight" when the death was caused; and third, it required the jury to find that the immediate flight was "therefrom," or from the predicate felony rather than from some other event. *See Webster's New World College Dictionary* at 1485 (defining "therefrom" as "from this; from that; from it"). We conclude that the immediate flight language in the instruction was well within the comprehension of the jury.

Contrary to Auman's contention, the instruction, as worded, expressly required the jury to find a causal relationship between the burglary, flight, and death. The term "immediate" requires a close connection between the burglary, flight, and death. The presence of the word "flight" in the instruction required the jury to find that one of the participants was still attempting to evade

---

**14.** As noted, the fifth element of the Colorado Criminal Jury Instruction on felony murder, CJI–Crim. 9:02, uses the same language used here by the trial court in its instruction to the jury: "in the course of or in [the] furtherance of [applicable felony], or in the immediate flight therefrom."

**15.** We review the alleged omissions in the jury instruction for plain error. *See Griego v. People,* 19 P.3d 1, 7–8 (Colo.2001) (discussing plain error).

capture at the time of death. Further, the instruction required the jury to find that Officer VanderJagt's death occurred in the immediate flight "therefrom," *i.e.,* that death was caused while one of the participants was fleeing from the burglary rather than from some other event.

The only statutory limitation not expressly included in the instruction was that a participant must have been "in the course of or in furtherance of" immediate flight when death was caused. In parsing the language used in the actual instruction tendered to the jury, we note that the court used the term "in" to describe Auman's potential liability for a death caused "in the immediate flight [from the burglary]." The term "in" has a nearly identical meaning to the phrase "in the course of." *Webster's New World College Dictionary* at 719 (defining "in" as "during the course of"). Because the term "in" and the phrase "in the course of" are nearly synonymous, we conclude that the phrase at issue in the instruction submitted here, "in the immediate flight therefrom," may reasonably be understood as meaning "in the course of immediate flight therefrom," consistent with the required language of section 18–3–102(1)(b).

While there is no express reference to "in furtherance of" in the immediate flight portion of the instruction, it is significant that in the felony-murder statute, the phrases "in the course of" and "in furtherance of" are phrased in the disjunctive, requiring that the jury find that the death was caused either "in the course of" or "in furtherance of" immedi-

ate flight. As we discussed earlier, the phrase "in immediate flight therefrom" is synonymous with "in the course of immediate flight therefrom." Here, in convicting Auman of felony murder, the jury must necessarily have found that Officer VanderJagt's death was caused "in the course of immediate flight" from the burglary. Without considering any other factors affecting the validity of her conviction, this finding would be legally sufficient to convict her of felony murder even though the jury was not expressly instructed on the alternative language of "in furtherance of." *See People v. Dunaway,* 88 P.3d 619, 629 n. 9 (Colo.2004) (concluding that where elements of instruction were disjunctively phrased, proof of one was sufficient).

Although the instruction should have tracked the precise language of the felony-murder statute, the instruction required the jury to find that Auman committed burglary; that she or Jaehnig was in immediate flight from the burglary when death was caused; and that there was a necessary causal connection between the burglary, flight, and death. Under these circumstances, we hold that the trial court's instruction, while not complete, did not constitute reversible error.

Next, Auman argues that the trial court committed reversible error by failing to submit to the jury her tendered supplemental instruction defining immediate flight and the factors that could terminate flight, ranging from intervening causes to arrest to the distance and time between the felony and death.[16] Initially, we note that in a felony-

---

**16.** In full, Auman's tendered "immediate flight" instruction read as follows:

Immediate Flight means that no intervening event has broken the continuity of the underlying crime; a person is not in the immediate flight from a burglary if an entirely new episode of events has begun; nor is a person in immediate flight if she has reached a point of temporary safety or is subject to complete custody at the time the death is caused.

The factors to be considered in determining whether the burglary was still in progress or had been terminated by intervening events are as follows:

1. Whether the location of the burglary was the same as that where the death was caused[;]
2. The distance between the locations[;]
3. The interval of time between the burglary and the death[;]

4. Whether the defendant still possessed the fruits of the burglary at the time the death was caused[;]
5. The causal relationship between the underlying felony and the causation of death[;]
6. Whether the co-perpetrator of the burglary had committed intervening acts which weakened any causal connection between the burglary and the death[;]
7. Whether the death was too dependent on another person's volitional act to have just bearing on the defendant's culpability[;]
8. Whether the police were in close pursuit of the defendant at the time the death was caused[;]
9. Whether the defendant had reached a place of temporary safety or was in complete custody at the time the death was caused.

murder case where a death occurs in the course of or in furtherance of immediate flight, the trial court's instruction must include, either explicitly or implicitly, the four limitations on immediate flight which we have set forth in this opinion pursuant to our reading of the felony-murder statute. However, with regard to providing specific definitions of terms, it is well established that it is within the discretion of the trial court to submit an instruction to the jury providing supplemental guidance in a criminal setting. *See People v. Rodriguez*, 794 P.2d 965, 987–88 (Colo.1990); *People v. Ross*, 179 Colo. 293, 298, 500 P.2d 127, 129 (1972). Because each felony-murder case in which a death is caused after a defendant's arrest must be decided according to its unique set of circumstances, a trial court has the discretion to—but is not required to—further define immediate flight and the factors which may terminate flight. In this case, the instruction submitted by the trial court included, in effect, the four limitations on immediate flight contained in the felony-murder statute. Accordingly, the trial court did not abuse its discretion in declining to submit to the jury Auman's tendered supplemental immediate flight instruction.

## B. The Lack of an Intervening Cause Instruction

We now turn to Auman's final argument on this issue, in which she contends that the trial court erred by not submitting an intervening cause instruction to the jury. Auman claims that Jaehnig may have been fleeing from police for reasons unforeseeable to her, such as because the Trans Am he was driving was stolen or because he had high levels of methamphetamines in his system,[17] and not because of the alleged burglary.

Auman did not tender a traditional intervening cause instruction to the jury. However, her supplemental immediate flight instruction would have required the jury to consider whether Jaehnig "committed any intervening acts which weakened the causal connection between the burglary and the

death" and "whether the death was too dependent on another person's volitional act to have just bearing on [the] defendant's culpability."

In *People v. Calvaresi*, we stated that to be liable for a homicide offense under Colorado law, death must be a "natural and probable consequence of the [defendant's] unlawful act." 188 Colo. 277, 283, 534 P.2d 316, 319 (1975) (quoting 1 *Wharton's Crim. Law & Pro.* § 200, at 448 (12th ed.1957)). *See also State v. Martin*, 119 N.J. 2, 573 A.2d 1359, 1374 (1990) (following Model Penal Code, court concludes that "probable consequence" is one that is reasonably foreseeable).

If an act of some other person, or intervening cause, breaks the causal connection between the defendant's unlawful acts and the victim's injury, then the defendant is relieved of liability. *People v. Stewart*, 55 P.3d 107, 121 (Colo.2002). As a threshold matter, a defendant is not entitled to an intervening cause instruction unless the following three conditions are met: first, a defendant must introduce competent evidence to show that the ultimate harm would not have occurred in the absence of the claimed intervening cause; second, a claimed intervening cause must be one that the defendant could not foresee; and third, such a cause must be one in which the defendant does not participate. *Id.* at 121; *People v. Saavedra–Rodriguez*, 971 P.2d 223, 228–29 (Colo.1998); *Calvaresi*, 188 Colo. at 283, 534 P.2d at 319.

Initially, we turn to *Saavedra–Rodriguez*, where the defendant, who stabbed the victim in the chest, made an offer of proof that improper medical care contributed to the victim's death. 971 P.2d at 225. In that case, we held that the defendant was not entitled to an intervening cause instruction because he had not offered sufficient evidence to prove that the victim's death would not have occurred in the absence of the intervening cause, *i.e.*, the improper medical care. *Id.* Similarly, Auman claimed that Jaehnig's actions—driving a stolen Trans

17. At trial, Auman's expert testified that the high levels of methamphetamines in Jaehnig's system

would have made him aggressive and reckless.

Am and using methamphetamines—were intervening causes, but she failed to introduce any evidence to show that Officer VanderJagt's death would not have occurred absent these alleged intervening causes. Because Auman failed to satisfy one of the threshold requirements warranting an intervening cause instruction, the trial court did not commit reversible error in not submitting an intervening cause instruction to the jury. *See also Stewart,* 55 P.3d at 121 (holding defendant was not entitled to intervening cause instruction because claimed intervening cause did not occur between the unlawful act and the ultimate harm).

Further, the two contributing causes alleged by Auman do not meet the threshold requirements to be deemed intervening causes because they occurred, or existed, prior to Auman's unlawful acts. Accordingly, there was no conduct which "intervened" to break the chain of causation between Auman's unlawful acts and Officer VanderJagt's death. Thus, we hold that the trial court did not commit reversible error in not submitting an intervening cause instruction to the jury.

## V. AUMAN'S FELONY–MURDER CONVICTION MUST BE REVERSED BECAUSE THE JURY WAS IMPROPERLY INSTRUCTED ON THE PREDICATE FELONY UPON WHICH HER FELONY–MURDER CHARGE WAS BASED

We next consider Auman's claims concerning the erroneous instruction on theft. This issue was raised by Auman in the court of appeals and argued to us as part of her appeal because Auman's intent to commit theft was a required element of second degree burglary, the predicate felony for her felony-murder conviction. In granting certiorari review, our focus was primarily on two issues: (1) whether arrest terminates a co-participant's liability for felony murder while another participant remains in flight; and (2) whether the instruction on felony murder appropriately reflected the requirements of

our felony-murder statute and properly connected the predicate felony, flight, and the resulting death. Related to the propriety of the felony-murder instruction, although not the primary focus of our certiorari questions, is the issue of whether the error in the definition of the predicate felony warrants reversal of Auman's convictions. We therefore now address the error in the theft instruction.

### Analysis

Turning to the instruction on theft, we note that the People concede that this instruction was erroneous. The court of appeals determined that the instruction was erroneous but concluded that the error did not require reversal. The question for us to determine is whether this improper instruction constitutes reversible error.

### A. The Error in the Theft Instruction

A person commits second degree burglary [18] when he or she knowingly breaks an entrance into a building or occupied structure with the intent to commit a crime therein. § 18–4–203(1), 6 C.R.S. (1998). To be guilty of second degree burglary, Auman must have had the specific intent to commit the crime of theft when she unlawfully entered Cheever's room. *See Cooper v. People,* 973 P.2d 1234, 1240 (Colo.1999) (holding that the crime of burglary requires that the person have "intended to commit a crime inside at the moment he first became a trespasser"), *disapproved on other grounds by Griego,* 19 P.3d at 7–8. Theft, in turn, occurs when a person knowingly obtains or exercises control over another's valuable property, knowing that he or she is without authorization to do so, and intends to permanently deprive the other person of the use or benefit of the property. § 18–4–401, C.R.S. (2004).

▇ Here, the theft instruction given to Auman's jury failed to expressly modify the "without authorization" element of the crime of theft with the culpable mental state of "knowingly." The instruction told the jury:

---

18. The jury acquitted Auman of first degree burglary but found her guilty of second degree burglary and conspiracy to commit first degree burglary. Because conspiracy to commit burglary

cannot, by definition, serve as a predicate felony for a felony-murder conviction, Auman's second degree burglary conviction served as the predicate felony for felony murder.

The elements of the crime of Theft are:

(1) That the Defendant,

(2) in the State of Colorado, on or about November 12, 1997,

(3) knowingly,

    (a) obtained or exercised control over,

    (b) anything of value,

    (c) which is the property of another,

(4) *without authorization,* or by deception, and

(5) with intent to permanently deprive the other person of the use or benefit of the thing of value.

(Emphasis added.)

Auman asserts, and the People agree, that the error occurred in the omission of "knowingly" from paragraph four of the instruction. While they disagree on the impact of this error on Auman's convictions, both parties cite *People v. Bornman,* 953 P.2d 952 (Colo. App.1997), in their respective discussions of the error. In *Bornman,* the court of appeals held that the trial court committed reversible error when it gave a theft instruction nearly identical to the one given here.[19] *See* 953 P.2d at 954. The court held that the theft instruction was erroneous because it "allowed a guilty verdict to be returned without a determination that [the] defendant was aware of his lack of authority." *Id.* Because the court determined that the primary issue at trial concerned the subject of this instructional error, *i.e.,* whether the defendant was aware that he was unauthorized in taking the property at issue, it reversed the defendant's theft conviction. *Id.*

In *Bornman,* the defendant was charged with theft, and the error in the theft instruction thus affected only his conviction for that crime. Here, Auman was not charged di-

rectly with theft but, rather, with burglary. While, as in *Bornman,* the instruction was erroneous in allowing a guilty verdict to be returned without requiring the jury to determine whether Auman was aware of her lack of authority over the property that she took, we must consider the effect of this error in relation to Auman's burglary conviction.[20]

To convict Auman of burglary, a properly instructed jury would have been required to find that she intended to commit theft when she unlawfully entered Cheever's room. However, here, as a result of omitting the required culpable mental state from the "without authorization" element, the improper instruction could have led Auman's jury to convict her of burglary based only on a finding that Auman and the others with her were in fact without authorization in taking Cheever's property, irrespective of what their intent was when they illegally entered Cheever's room. In simpler terms, the erroneous theft instruction, when incorporated into the instruction on second degree burglary, allowed the jury to convict Auman of burglary without requiring them to find that she intended to knowingly take Cheever's property without his authorization (to steal his property) at the time of unlawful entry.[21]

In failing to require the jury to find that Auman intended to commit theft when she unlawfully entered Cheever's room, we conclude that the error allowed the jury to convict Auman of burglary even if they found that she did not form the intent to steal Cheever's property until after she entered Cheever's room. Whether this error impacted Auman's burglary conviction is vigorously disputed by both parties and is dependent upon a record review of the evidence linking Auman to the crime of burglary. Before assessing the impact of this error, we first

---

**19.** Like the concededly erroneous instruction in this case, the theft instruction in *Bornman* failed to expressly modify the "without authorization" element with the mens rea term "knowingly." *See* 953 P.2d at 953.

**20.** Although neither Auman nor the People cited *Bornman* to the trial court, both parties agree that the theft instruction, as tendered and obtained from the 1993 pattern Colorado Criminal Jury Instruction on theft, CJI–Crim. 16:01, was incorrect. We note that the *Bornman* case was decided after the 1993 update, which is the most

recent version, of the pattern instruction on theft. It is therefore understandable that this improper instruction was given to Auman's jury.

**21.** The error in omitting "knowingly" from the "without authorization" element is not cured by the fact that "or by deception" was included in the instruction on that element. Neither evidence nor argument was presented that Auman, or the others with her, committed theft by deceiving Cheever.

address the standard of review appropriate for our analysis.

## B. Standard of Review

Not all instructional errors require reversal of a defendant's convictions. Instead, we evaluate the evidence pertaining to the subject of the instructional error under the appropriate standard of review to determine the impact, if any, of the error on the jury's verdict. In this case, we must determine whether the subject of the error was in dispute at trial and, if so, whether there was overwhelming evidence of the defendant's guilt such that we can say that the error was effectively cured.

We review for plain error rather than constitutional harmless error.[22] The instructional error here was of constitutional magnitude, but it was an error to which Auman made no objection at trial. Our case law is conflicting as to whether plain error or constitutional harmless error review applies in such a situation.[23] We leave the resolution of this conflict for another day and review here for plain error because a finding of plain error implies a finding of constitutional error.

■ Plain error review requires us to focus upon whether the instructional error prevented the jury from making a finding that the law requires so as to affect a substantial right of Auman's and undermine the fundamental fairness of her trial. In this regard, we must determine whether a reasonable possibility exists that the erroneous instruction contributed to Auman's conviction such that serious doubt is cast upon the reliability of the jury's verdict. *See Stewart,*

55 P.3d at 119; *People v. Garcia,* 28 P.3d 340, 344 (Colo.2001).

■ In reviewing for plain error, we are not concerned with whether there was sufficient evidence to convict Auman of burglary, which would require us to review the evidence in the light most favorable to the prosecution and to uphold her conviction if the record reveals that there is substantial evidence to support the jury's verdict. *See Mata–Medina v. People,* 71 P.3d 973, 983 (Colo.2003). Instead, "[f]ailure to instruct the jury properly does not constitute plain error where the subject of the error in the instruction is not contested at trial, or where evidence of the defendant's guilt is overwhelming." *Bogdanov v. People,* 941 P.2d 247, 255 (Colo.1997), *opinion amended on other grounds by Bogdanov v. People,* 955 P.2d 997 (Colo.1997), *disapproved on other grounds by Griego,* 19 P.3d 1. If the error concerned an uncontested issue, or if the evidence of her guilt is overwhelming, then Auman's substantial rights were not affected, and no reasonable possibility exists that the improper instruction contributed to her conviction. However, if the evidence of her guilt is not overwhelming, and if there existed an evidentiary dispute as to whether Auman intended to commit theft when she entered Cheever's room, then it is likely that Auman's substantial rights were affected, and a reasonable possibility exists that the improper instruction contributed to her conviction. In such a case, serious doubt would be cast upon the fairness of Auman's trial and the reliability of her convictions, and reversal would be required. *See Bogdanov,* 941 P.2d at 255 (citing *People v. Fichtner,* 869 P.2d

---

**22.** We do not consider the error here to have been invited by Auman. Although Auman tendered the second degree burglary instruction, the error at issue is in the theft instruction which was not tendered by her defense. Instead, the theft instruction was required for incorporation into the instruction on first degree burglary as well. Because Auman did not cause or invite the error in the theft instruction, we conclude that the invited error doctrine does not apply. *See People v. Zapata,* 779 P.2d 1307, 1309 (Colo. 1989).

**23.** Our precedent indicates that we have applied, or at least discussed applying, the plain error or

the constitutional harmless error standard of review to an error of constitutional dimension not objected to at trial. *See Auman,* 67 P.3d at 758 (recognizing split of authority regarding appropriate standard of review). For cases applying constitutional harmless error, see *People v. Harlan,* 8 P.3d 448, 490 (Colo.2000); *People v. Davis,* 794 P.2d 159, 189 (Colo.1990); and *People v. Rodgers,* 756 P.2d 980, 984 (Colo.1988). For cases suggesting an application of plain error under such circumstances, see *Griego,* 19 P.3d at 7–8; and *People v. Dunlap,* 975 P.2d 723, 737 (Colo.1999).

539 (Colo.1994) and *People v. Cowden*, 735 P.2d 199 (Colo.1987)).

### C. The Impact of the Error

Having determined that we will review the improper instruction for plain error, we discuss the arguments and evidence presented at trial to assess the impact of the instructional error on Auman's burglary conviction to determine whether reversal is required. The plain error standard of review requires us to focus on the quantum and certainty of evidence presented at trial on either side of the issue in question.

### 1. The Evidence Presented

Auman's counsel argued that she went to the Lodge to retrieve property that was hers in Cheever's room and that she did not go there to take any of Cheever's property. Her attorneys advanced two positions to claim that she did not commit burglary. First, they conceded that Auman may have been guilty of criminal trespass when she illegally entered Cheever's room, but, nonetheless, they argued that she did not commit burglary because she did not intend to take Cheever's property. Second, they argued that Auman did not commit burglary because the actual taking of Cheever's property by Gerze and Duprey occurred suddenly and only after gaining entry into Cheever's room. They claimed she did not know in advance that his property would be taken.

By making these arguments, Auman's defense was in effect claiming that the evidence established that she was not guilty of burglary because she had no intent to take Cheever's property when she entered his room. Unlike the crime of burglary, the crime of trespass does not require the intent to steal at the time of unlawful entry as does the charge here of burglary—breaking and entering with the intent to commit theft. In addition, if Auman formed the intent to take Cheever's property after the illegal entry, she would not have committed burglary. As we have stated: "If the defendant forms the intent to commit the crime after the trespass is under way, he or she may be guilty of that underlying crime ... and of trespass—*but is not guilty of burglary*. Both circumstances reflect criminal acts, but burglary is the more serious." *Cooper*, 973 P.2d at 1236 (emphasis added). Thus, with respect to burglary, although not expressly articulated by her attorneys, Auman's theory of defense and her attorneys' arguments centered upon the intent she had when she entered Cheever's room unlawfully.[24]

Auman's attorneys argued that she did not have the intent to take Cheever's property at the time of unlawful entry. In closing, her attorney stated, "We know when they went in there that she went and got her stuff." Her attorney pointed out that Auman's things were in Cheever's room because she had until recently been spending time in that room. He stated: "All she wanted to do was to get her stuff," and he repeated this theme throughout his closing remarks.

During her two police interviews, Auman said, "I just went up there for my stuff," or words to that effect, more than twenty times. In her statements, Auman told of some of the items she wanted to retrieve: for example, her camera and some CDs. Cheever admitted that three of the CDs recovered from the cars were Auman's. He also testified that one of the two camcorders that was taken belonged to Auman. In addition, Auman's checkbook was discovered in Cheever's room in a police search following the reported burglary.

---

**24.** Throughout our discussion of the evidence and arguments presented, we refer to Auman's intent to commit theft at the time of trespass. Although a complicity instruction for the burglary charges was given and the evidence could have supported a finding that Auman's role in the alleged burglary was that of either a complicitor or a principal, under either theory of criminal liability, Auman, herself, must have intended to commit theft when she unlawfully entered Cheever's room irrespective of whether the jury viewed her as a principal or as a complicitor in the commission of burglary. *See Bogdanov*, 941 P.2d at 250–51 (explaining that "(1) the complicitor [must have] the culpable mental state required for the *underlying crime* committed by the principal; and (2) the complicitor [must] assist[] or encourage[] the commission of the crime committed by the principal 'with the intent to promote or facilitate' ... such commission" (emphasis added)); *see also Palmer v. People*, 964 P.2d 524, 528 (Colo.1998).

Supporting Auman's argument that she just intended to retrieve her things, and not take Cheever's property, was the testimony of both Gerze and Soriano who said that they went to the Lodge to remove only Auman's things. Also supporting Auman's view of the evidence was the testimony of Mary Lucas, a tenant at the Lodge and a prosecution witness, who said that Duprey told her as he carried items from Cheever's room: "All I know is this chick wanted us to come help her get her stuff."

Auman did concede that the group at some point in time took some of Cheever's things. Her attorneys argued that this taking was neither intended nor planned by Auman. Pointing to her police statement where she said, "And then all of a sudden it wasn't just taking what I had paid for," they argued that events at the Lodge escalated beyond Auman's control to the point at which Cheever's property was taken but only after entry was gained into his room. The defense indicated that Gerze and Duprey may have planned on burglarizing Cheever's room before they went to the Lodge [25] but that the men's intent to commit theft was shared only among themselves and not with or by Auman.

To counter evidence that Auman, herself, and not just the two men, had taken some of Cheever's things from his room, Auman's defense counsel argued that she believed she was justified in taking those items for which she had personally paid. Auman did not dispute that she had given Cheever some of the items which were recovered from the later police search of the group's two cars. However, she claimed that because she had paid for these items, she was authorized to take them. In her police statements, she referred to these items as "rightfully" belonging to her. Thus, she argued she was not guilty of burglary because she had intended when she entered Cheever's room unlawfully to reclaim only property that was hers.

With respect to whether Auman could be held liable for burglary as a complicitor, the defense pointed to both Gerze's and Soriano's testimony that they went to the Lodge only to get Auman's things and not to steal anything. Also, the defense argued that the behavior of the others after they had removed Cheever's items inferentially established that they were not aware that they had committed a crime, much less that they had intended to commit burglary. They pointed to Gerze's testimony that he did not think they were committing a crime and that, as a result, the group did not interfere with Dan Mattson, a tenant at the Lodge, when he openly recorded their license plate numbers. Gerze testified that he still did not know if some of the things that had been taken were in fact Cheever's. He said he had never been to the Lodge before, and he did not know which things in Cheever's room belonged to Cheever: "I assumed anything we were taking belonged to [Auman]."

Other evidence inferentially supported Auman's theory that she did not commit burglary. Lucas testified that Auman pulled back the blanket covering the doorway to the common TV room and said "hi" to her during the alleged burglary. This, the defense argued, would not have happened if Auman had been aware she was committing the crime of burglary. Soriano testified that before driving to the Lodge, Auman told her she was concerned Cheever would fight with her "over some things she had written checks for." According to Soriano, one of these items was the snowboard which the prosecution claimed was stolen by the group. Cheever testified equivocally as to whether he owned the snowboard, saying that he "assume[d]" that it belonged to him, and admitted that Auman had bought it for him. In sum, the defense pointed to substantial evidence indicating that Auman had not possessed the required intent when she unlawfully entered Cheever's room to be guilty of burglary.

In contrast to the aspects of the evidence we have highlighted concerning Auman's theory that she was guilty of trespass and not of burglary, the prosecution argued that Auman and her co-participants fully intended to take Cheever's property before going to the Lodge and, thus, necessarily committed bur-

---

**25.** Defense counsel told the jury, "And once in the [L]odge, Gerze and Duprey did what they wanted to do, what they wanted to do, not what [Auman] wanted them to do."

glary when they illegally entered Cheever's room by cutting the padlock on the door to his room. They argued that Auman, acting as either a principal or a complicitor, intended to take Cheever's things (and thereby commit burglary) to retaliate against Cheever for ending their relationship. They claimed that a theft occurred because the undisputed evidence showed that items belonging to Cheever had in fact been taken which, they argued, inferentially proved that Auman and the two men intended to commit theft, and thus committed burglary, when they entered Cheever's room.

The prosecution pointed to Auman's police statement where she said that the night before the alleged burglary she had been questioned by one of the men as to what "else" Cheever had in his room, and she admitted that "I opened my big mouth and I told . . . that he had a couple of big speakers." The prosecution argued that this statement, coupled with the fact that the two stereo speakers, which Auman did not dispute were Cheever's, were recovered from the group's cars, established that Auman intended to take Cheever's property and help the others do so as well.

The People also argued that Auman's behavior the morning of the alleged burglary showed that she intended to commit theft before going to the Lodge. Soriano testified that on that morning, Auman expressed second thoughts about going to the Lodge. In addition, the People pointed to Auman's admissions to police that she had told Soriano before going to the Lodge that she did not want to "go through with it" and that she had also told Gerze "just don't kill [Cheever]" as evidence that she knew the group intended to commit an illegal act—burglary. The People also argued that the group took bolt cutters to the Lodge because Auman intended to take Cheever's things.

In support of the prosecution's retaliation theory, Lucas testified that although Auman and Cheever had dated, they had broken up about one week earlier, at which time Cheever had placed the padlock on the door to his room to keep Auman out. Also, Mattson testified that when he saw Auman carrying a snowboard down the hallway from Cheever's

room, she said, "[Cheever] really fucked up this time." Further, Auman, herself, admitted in her statements to police that "I wanted to . . . retaliate." Also, in Soriano's initial police statement, she admitted that they "wanted to scare [Cheever] . . . ."

The prosecution also argued that inconsistencies in Auman's and her co-participants' account of events rendered their versions untrustworthy and self-serving. Although Soriano and Gerze testified that they did not go to the Lodge to take Cheever's property, both had previously admitted under oath, when they pled guilty to the second degree burglary of Cheever's room, that they did enter his room with the intent to take his property. The People also argued that although Auman and Soriano had no contact with each other after leaving the Lodge, they independently gave the same false names to police of two of the three men involved, Gerze and Duprey, telling them their names were John and Dan. This identity of names, they argued, revealed a plan not only to commit the burglary but to cover it up as well.

In closing, the prosecutor argued that the jury should infer that the group intended to commit theft, and thus committed burglary, because Cheever's property was in fact taken. He stated: "There was definitely a theft. Things were definitely stolen out of Shawn Cheever's room." The prosecutor also argued that inconsistencies in Auman's two police interviews, in which she admitted at one point that "[e]arlier . . . I fibbed a little bit," required the jury to discount her version of events.

## 2. Evaluation of the Evidence

As our summary of the evidence and the arguments made by both sides reveals, the subject of the instructional error—Auman's intent, or lack thereof, to steal Cheever's property at the time of unlawful entry—was contested. Auman pointed to a substantial amount of evidence, both direct and circumstantial, and argued reasonable, credible inferences based upon the evidence that she did not possess the required criminal intent at the time of the trespass necessary to find her guilty of burglary. Throughout the trial,

including during opening and closing arguments, defense counsel maintained that Auman's intent when she unlawfully entered Cheever's room was to retrieve her property and those items she believed were hers. It was, they stressed, never her plan or intent at the time of unlawful entry to steal Cheever's things. Auman's defense to burglary thus centered upon the subject of the erroneous instruction. Hence, we conclude that the erroneous instruction effectively omitted an explanation that the law requires on an issue vigorously contested by Auman.

To determine whether the evidence of Auman's guilt of burglary was overwhelming, we briefly summarize the evidence already discussed. Auman's theory of defense was that she had entered Cheever's room unlawfully but that she had done so only to retrieve her property. According to Auman, the others with her took Cheever's property after they unlawfully entered the room. By admitting to unlawful entry, Auman conceded that she committed the crime of criminal trespass, a crime which is not the same as second degree burglary but, rather, is a lesser included crime of burglary. If the jury believed Auman's theory of defense that she did not intend to steal when she unlawfully entered Cheever's room, then one element necessary to find her guilty of the crime of burglary was missing.[26] In other words, if the jurors believed Auman formed the intent to steal after she unlawfully entered Cheever's room, then she would have been entitled to an acquittal on this charge. We therefore must evaluate the evidence of Auman's guilt to determine whether it was sufficiently overwhelming so as to cure the instructional error.

The prosecution's argument for guilt of burglary involved the following main points: Cheever's property was in fact taken; Auman told about Cheever's stereo speakers the night before the alleged burglary; the group took bolt cutters to the Lodge; Auman intended to retaliate against Cheever; Soriano and Gerze pled guilty to burglary; and Auman had second thoughts about going to the Lodge the morning of the alleged burglary, fearing that the men might kill Cheever. These circumstances may have led the jury to infer that Auman intended to steal Cheever's property when she entered his room unlawfully.

However, these circumstances are also subject to contrary and competing inferences. For example, the taking of Cheever's things could be viewed as the men doing what they wanted to do, independent from what Auman had intended and anticipated. Taking the bolt cutters could be viewed as evidence that Auman knew she would need to break into Cheever's room to retrieve her things even if she had no intention of taking Cheever's property. Similarly, the jury could have believed that Auman intended to retaliate by retrieving her property and those items which she had bought for Cheever, and not by stealing Cheever's property. Thus, the circumstances relied upon by the prosecution to argue Auman's guilt of burglary do not lead to the inescapable conclusion that she intended to steal at the time of unlawful entry.

The possibility of these competing inferences, when coupled with Auman's presentation of credible arguments based upon the evidence that she did not have the intent to steal when she unlawfully entered Cheever's room, leads us to conclude that the evidence, when viewed as a whole, did not present such an overwhelming case of Auman's guilt of burglary as to cure the instructional error. Auman told police numerous times that she returned to get her stuff which was in Cheever's room; Soriano and Gerze testified that they went to take only Auman's things; and even after the group left, Auman's checkbook was found in Cheever's room.

Because the evidence of Auman's commission of burglary was not overwhelming, it is reasonably possible that the improper instruction contributed to her burglary conviction. The instruction allowed the jury to convict her without resolving the contested

---

**26.** While Auman could possibly have been convicted of theft if the jury believed she stole Cheever's property or was a complicitor to that crime, she was not charged with the crime of theft. Theft is not a specifically enumerated predicate crime necessary to establish liability for felony murder. *See* § 18–3–102(1)(b).

issue of whether she possessed the criminal intent necessary to commit burglary. By effectively omitting the requirement that the jury find that Auman intended to steal Cheever's property when she unlawfully entered, the erroneous instruction allowed the jury to convict her of burglary even if they believed her defense that she did not enter Cheever's room intending to steal his property. In other words, even if the jury believed Auman entered with the intent to retrieve just her property and then, only after entry, contrary to her plan and unanticipated by her, she went along with the men in taking Cheever's things, they still could have convicted her of burglary because the erroneous instruction did not require them to determine whether she intended to steal when she unlawfully entered.[27] The erroneous instruction could have falsely led Auman's jury to convict her of burglary whether they believed either the prosecution's theory of the case or her theory of defense. Our review of the record reveals that the evidence was not so overwhelming as to effectively cure this error.

▮ The impact of Auman's conspiracy to commit first degree burglary conviction does not change our analysis. The jury may have found, based upon the facts here and the instructed elements of both the crime of conspiracy and the crime of burglary, that Auman, after entering without the intent to commit theft, took advantage of the situation by assisting the others in taking, or actually taking, herself, Cheever's property. Spontaneously acting in concert with the others to take more than her things would make her guilty of conspiracy to commit burglary because the agreement necessary for that crime is implied by the actions of the co-conspirators. It is well established that to prove conspiracy, "[i]t is not necessary to prove that co-conspirators came together and actually agreed in terms to have a common design and to pursue it by common means." *People v. Torres*, 536 P.2d 868, 871 (Colo.

App.1975) (citing *Smaldone v. People*, 103 Colo. 498, 510, 88 P.2d 103, 110 (1938)). Rather, to establish a conspiracy, it is sufficient that the acts of the co-conspirators demonstrate that they pursued the same object, with one performing one part and the other another part. *Id.*

With respect to the entry element, the Auman jury instructions contained different statutory requirements for first degree burglary and second degree burglary. First degree burglary required either "unlawfully entering" or "remaining unlawfully." As instructed, second degree burglary did not include the element of "remaining unlawfully." When taken together, the conspiracy and first degree burglary instructions did not require the jury to find a link between Auman's intent to steal and her unlawful entry into Cheever's room, which is the requirement of second degree burglary. Auman's jury could have believed that Auman "remained unlawfully" in Cheever's room and then conspired with the others to steal. As a result, her conspiracy conviction for first degree burglary does not indicate whether her intent to steal was formed when she entered or after entry. Hence, the conspiracy verdict does not impact our analysis of whether the evidence was sufficiently overwhelming so as to cure the instruction's failure to require the jury to find Auman's intent to commit theft at the time of unlawful entry.

Likewise, the fact that the jury found Auman guilty of second degree burglary, and not specifically of criminal trespass, does not affect our analysis. The crime of trespass is included or implied in the jury finding of second degree burglary. In other words, second degree burglary requires a criminal trespass (unlawfully entering) plus additional elements. Of relevance here, one of these additional elements is that a person must possess the intent to steal when the unlawful entry occurs. As discussed, Auman's jury was never instructed on this necessary element. Thus, its conviction of Auman for

---

27. We note that the prejudicial impact of the erroneous instruction may have been unintentionally reinforced by the People's closing argument that Auman was guilty of burglary because Cheever's property was in fact taken. This argument may have increased the likelihood that the jury could find Auman guilty of burglary irrespective of whether she intended to steal Cheever's property when she entered his room unlawfully, or at some later time, and thus possibly undermined her defense.

second degree burglary does indicate that it found that she committed criminal trespass and, further, that Cheever's property was in fact stolen. Auman never disputed either that she was guilty of criminal trespass or that Cheever's property was eventually taken. We cannot place any significance on the jury's decision to convict her of second degree burglary based on a faulty instruction for that crime.

We conclude that the instructional error here substantially affected Auman's right to a full and fair jury consideration of her defense to burglary. It is thus reasonably possible that the error contributed to Auman's burglary conviction such that the fundamental fairness of her trial is called into question and serious doubt is cast upon the reliability of the jury's verdict. The improper theft instruction therefore constitutes plain error, and we reverse Auman's second degree burglary conviction.

As we explained earlier, Auman's felony-murder conviction is premised upon her second degree burglary conviction. Therefore, because this burglary conviction must be reversed, so must the felony-murder conviction.

Accordingly, we vacate Auman's judgments of conviction for felony murder and second degree burglary and remand for a new trial.

## VI. CONCLUSION

For the reasons stated, we reverse the court of appeals' decision and remand this case to that court with directions to return it to the trial court for a new trial.

Chief Justice MULLARKEY concurs in part and dissents in part.

Justice RICE and Justice COATS do not participate.

MULLARKEY, C.J., concurring in part and dissenting in part.

I respectfully dissent from part V of the majority opinion and its judgment reversing the defendant's convictions.

This case turns on the effect of an error in a jury instruction describing the state of mind required to commit the crime of theft.

Because the defendant did not object to the jury instruction, the trial court had no opportunity to correct the instruction, and the error was not properly preserved for review on appeal. Crim. P. 30 (requiring party to object to instructions before they are given to the jury and stating that only such objections will be considered on review). Consequently, this error can be considered on appeal only if it rises to the high standard of plain error "affecting substantial rights." Crim. P. 52. To constitute plain error, the error must be so obvious and serious that there is a reasonable possibility that the error contributed to the defendant's conviction. *People v. Stewart*, 55 P.3d 107, 120 (Colo. 2002). When the claimed plain error involves a jury instruction, we must evaluate it in the context of all of the jury instructions and the trial record as a whole. *Id.*

The majority finds in part V of its opinion that the theft instruction is plain error. It then reverses the defendant's convictions for second degree burglary and felony murder and remands the case for a new trial. In my opinion, the instruction error does not amount to plain error, and the defendant's convictions should be affirmed. I reach this conclusion by considering the error in the theft instruction together with the other jury instructions and the verdicts returned by the jury. I analyze the instructions and verdicts in light of the evidence before the jury and the parties' theories of the case, as argued to the jury.

As relevant to this part of the case, the amended complaint charged the defendant, Lisl Auman, with four crimes: first degree burglary, conspiracy to commit first degree burglary, second degree burglary, and conspiracy to commit second degree burglary. The burglary charges alleged that the defendant feloniously, unlawfully and knowingly entered a structure occupied by Shawn Cheever with the intent to commit the crimes of theft or theft by receiving against Cheever. The conspiracy charges alleged that the defendant and four other people (Mattheus Jaehnig, Demetria Soriano, Steven Duprey, and Dion Gerze) unlawfully and feloniously agreed to commit the crimes of burglary or

attempted burglary and committed an overt act in furtherance of the conspiracy.

The case was submitted to the jury with instructions on the four crimes charged in the information and on two additional crimes: first degree criminal trespass and conspiracy to commit first degree criminal trespass. The trespass charges were added at the defendant's request.

The jury rejected the defendant's criminal trespass theory and convicted the defendant of second degree burglary and conspiracy to commit first degree burglary.

As charged, theft and theft by receiving were the crimes underlying both first and second degree burglary. As instructed, however, theft and theft by receiving were the predicate crimes for first degree burglary but only theft was the predicate crime for second degree burglary. Turning to the theft instruction, I agree that the elements of the crime are not correctly stated. Jury Instruction 32 reads as follows:

The elements of the crime of Theft are:

(1) That the Defendant,

(2) In the State of Colorado, on or about November 12, 1997,

(3) Knowingly

    (a) obtained or exercised control over,

    (b) anything of value,

    (c) which is the property of another,

(4) without authorization, or by deception, and

(5) with intent to deprive the other person of the use or benefit of the thing of value.

The culpable mental states are defined in Instruction 34. "Knowingly" is explained as follows:

A person acts "knowingly" with respect to conduct or to a circumstance described by a statute defining an offense when she is aware that her conduct is of such a nature or that such a circumstance exists. A person acts "knowingly" with respect to a result of her conduct when she is aware that her conduct is practically certain to cause the result.

The crime of theft, now codified at section 18–4–401(1), C.R.S. (2004), provides in rele-vant part: "A person commits theft when he knowingly obtains or exercises control over anything of value of another without authorization, or by ... deception, and (a) Intends to deprive the other person permanently of the use or benefit of the thing of value."

Comparison of Instruction 32 and the statute shows that the instruction did not track the statutory language accurately. The instruction does not connect "without authorization or by deception" with the mental state of "knowingly." Under our case law, "knowingly" could have been placed in its own numbered paragraph and it would have applied to all conduct described in the succeeding numbered paragraphs. *People v. Bossert,* 722 P.2d 998, 1011 (Colo.1986). Under the format used in Instruction 32, "knowingly" was placed in paragraph (3). It applies to the conduct described in subparagraphs (a), (b), and (c) but it does not expressly apply to the "without authorization, or by deception" conduct contained in paragraph (4). The error could have been corrected easily if it had been brought to the court's attention. But we know it was not, and the issue before us is the likely effect of the error.

I doubt that the error had any direct effect on the jury's determination that a theft occurred. A proper theft instruction would have required the jury to determine whether the defendant obtained Cheever's property "knowingly without authorization or by deception." With respect to whether the defendant acted "knowingly without authorization," there was no factual dispute. Before the theft occurred, defendant knew that Cheever had not authorized her to take his property and she knew that the tripod and the sound system were his property. A few days earlier, Cheever had broken off his relationship with the defendant and padlocked his room to exclude the defendant from his room and its contents. The addition of the word "knowingly" would not have changed the jury's reliance on "without authorization."

Rather than relying on the mental state of "without authorization," the jury in this case could have found that the defendant acted

"by deception." Omission of "knowingly" from the phrase "by deception" seems to have little practical effect. The concept of acting "by deception" carries with it an inherent requirement of knowledge. One cannot accidentally or unknowingly act by deception. The common dictionary definition of deception is "the act of deceiving, cheating, hoodwinking, misleading, or deluding." Deception is described as "a general term for any sort of deceiving by whatever method for whatever purpose." Webster's Third New International Unabridged Dictionary 585 (1986). For these reasons, it seems highly unlikely that the error in Instruction 32 affected the jury's finding that the defendant committed theft, the predicate crime for burglary.[1]

The majority, however, finds the theft instruction to be a fatal error requiring reversal of the defendant's second degree burglary conviction and, ultimately, the defendant's felony murder conviction. Maj. Op. at 663–665. The majority notes that the crime of burglary required the defendant to unlawfully enter the premises with the intent to commit theft, and the defendant's intent when she entered Cheever's room was hotly contested. The prosecution contended that the defendant and her co-conspirators planned to steal Cheever's property from the time they first met on the night before the crimes and that they did steal his property. The defendant contended that she only intended to retrieve her belongings, and that the theft of Cheever's property happened spontaneously after they entered Cheever's room.

The majority reasons that the jury may have convicted the defendant of burglary without finding that she entered Cheever's room with the intent to commit theft, as properly defined, because the faulty instruction did not require the jury to determine that Auman knowingly acted without authorization or by deception. I acknowledge that there is a theoretical possibility that one or more of the jurors may have been misled by Instruction 32. But that possibility did not ripen into plain error. The record as a whole, especially the other instructions and the verdicts returned by the jury, demonstrate that the jury understood the decisions it was required to make. The verdicts show that the jury carefully differentiated among the charges against the defendant. It accepted the prosecution's theory in part and rejected it in part, and it rejected the defendant's defense. The error in Instruction 32 did not contribute to the defendant's convictions.

I turn first to the evidence and the parties' theories. The following facts are undisputed. The defendant, Soriano, Duprey, Gerze, and Jaehnig were all at Soriano's apartment in Denver on the evening of November 11, 1997. On the next day, the five drove to the Lodge. The defendant, Soriano, Duprey, and Gerze cut a padlock on Cheever's door and entered his room while Jaehnig waited in a car outside the Lodge. Various items were taken from Cheever's room including property that belonged to the defendant, property that belonged to Cheever, and property that the defendant had given to Cheever but claimed was rightfully hers. Cheever's property taken from his room included a tripod and a sound system consisting of an amplifier and two large speakers.

The prosecution's theory was that, on November 11, the defendant and the four others entered into a conspiracy to commit burglary. They agreed to break into Cheever's room in order to recover the defendant's property and to steal Cheever's property as revenge for Cheever's mistreatment of the defendant. They agreed to use force, including deadly force, against Cheever if necessary to accomplish their plan. On November 12, the conspirators carried out their plan.

---

1. Theft by deception does not require that the victim be deceived. Rather, the crime requires the actor to obtain the property of another by deception.

Here, the jury could have found that Auman's stated reason for going to the rooming house in the mountains where she had lived and where Cheever rented a room (the Lodge) and breaking into Cheever's room—that she only wanted to retrieve her "stuff"—was a ruse designed to conceal her true intent to take Cheever's property. The jury may have found that Auman used this ruse to recruit the other four people to help her or to lull the Lodge residents into complacency when they saw Auman and the others removing items from Cheever's room.

Although they were armed with deadly weapons, they did not encounter Cheever. They broke into his room and took various items including Cheever's tripod and sound system.

The defense theory was that the defendant only intended to retrieve her belongings from Cheever's room, and that the other four persons agreed to help her. There was no agreement to steal Cheever's property. In her view, Duprey and Gerze spontaneously decided to steal Cheever's sound system and tripod after they entered Cheever's room.

As evidence to support its theory, the prosecution relied on the undisputed evidence that Cheever's tripod and his sound system were stolen by the conspirators, that Jaehnig had several loaded guns in his car, and that Soriano and Gerze pled guilty to burglary. To prove motive and intent, the prosecutors relied on the defendant's videotaped statements to the police. In the tapes, Auman described her anger at Cheever and her desire for "revenge," saying she had been "screwed over," "insulted," and "treated like a piece of shit" by Cheever. She told the police that she sought help from the others because she needed some "muscle" to retrieve her stuff from Cheever's room.

Describing what happened on the evening of November 11, the defendant said she had asked the men not to kill Cheever but they refused to give her that assurance. One of the men asked her if Cheever had anything of value. Explaining her response, the defendant said, "I should never have opened my big mouth, but it's too late now, but I opened my big mouth and told him that he [Cheever] had a couple of big speakers." In its closing argument, the prosecution argued that this conversation on November 11, "is the Conspiracy. They're sitting around discussing it … The plan is set that night. That's the conspiracy."

Another indication that the defendant was aware that the planned trip to the Lodge involved criminal conduct that went far beyond mere retrieval of her property, occurred on the morning of November 12, Auman told Soriano that she did not want to go through with the plan and Soriano replied "Well, it's a little too late now."

The defendant supported her theory by emphasizing other parts of her videotaped statements in which she repeatedly stated that her intent was only to move her things out of Cheever's room. The testimony of Soriano and Gerze also supported the defense. Although both had pled guilty to burglary, each testified that there had been no plan to steal Cheever's property. Their only reason for breaking into Cheever's room was to help Auman get her things.

The defense theory that the defendant did not intend to steal Cheever's property was put before the jury in the defendant's opening statement and in the defendant's closing argument. The defense specifically argued that Auman was not guilty of burglary because she did not enter Cheever's room with the intent to steal his property. The defendant argued that, at most, she had committed criminal trespass by breaking into Cheever's room in order to retrieve her property. Indeed, defense counsel argued in closing arguments

> There was no First Degree Burglary at all. Lisl went into the room. Things were taken. She probably should not have been in there, we probably would all agree, but that's Criminal Trespass. Going in someplace where you don't have a right to be, that's not First Degree Burglary and its not Conspiracy to Commit First Degree Burglary or Complicity to Commit First Degree Burglary. There is nothing, nothing that she intended, that her conscious objective was to commit the burglary. There is nothing that said that with that knowledge, she intended to aid and abet and assist these people in anything.

Consistent with the defense theory, the jury was instructed on first degree criminal trespass and conspiracy to commit first degree criminal trespass. Instruction 28 informed the jurors that second degree burglary and first degree criminal trespass are lesser included offenses of first degree burglary. It stated that, if the jurors were not satisfied beyond a reasonable doubt that the defendant had committed first degree burglary, the defendant could be convicted of a lesser offense. The instruction concluded by advising the jury that, while it could acquit

the defendant of all three offenses, it could convict the defendant of only one of the three offenses. Jury Instruction 28 reads as follows:

If you are not satisfied beyond a reasonable doubt that the defendant is guilty of the offense charged, she may, however, be found guilty of any lesser offense, the commission of which is necessarily included in the offense charged if the evidence is sufficient to establish his guilt of the lesser offense beyond a reasonable doubt.

The offense of First Degree Burglary as charged in the Information in this case necessarily includes the lesser offense(s) of Second Degree Burglary and First Degree Criminal Trespass.

The elements of the crime of second degree burglary are:
1. That the defendant
2. in the State of Colorado, at or about the date and place charged,
3. knowingly,
4. broke an entrance into a dwelling or a building or occupied structure other than a dwelling
5. with an intent to commit therein the crime of theft.

The elements of first degree criminal trespass are:
1. That the defendant,
2. in the state of Colorado, at or about the date and place charged,
3. knowingly and unlawfully entered or remained in a dwelling.

You should bear in mind that the burden is always upon the prosecution to prove beyond a reasonable doubt each and every material element of any lesser included offense which is necessarily included in any offense charged in the information; the law never imposes upon a defendant in a criminal case the burden of calling any witnesses or producing any evidence.

After considering all the evidence, if you decide that the prosecution has proven each of the elements of the crime charged or of a lesser included offense, you should find the defendant guilty of the offense proven, and you should so state in your verdict.

After considering all the evidence, if you decide that the prosecution has failed to prove one or more elements of the crime charged or of a lesser included offense, you should find the defendant not guilty of the offense which has not been proved, and you should so state in your verdict.

While you may find the defendant not guilty of any or all of the crime(s) charged, or of any or all lesser included offenses; you may not find the defendant guilty of more than one of the following offenses:

First Degree Burglary

Second Degree Burglary

First Degree Criminal Trespass

Instruction 31 similarly instructed the jury that conspiracy to commit second degree burglary and conspiracy to commit first degree criminal trespass are lesser included offenses of conspiracy to commit first degree burglary. It likewise advised the jury that it could acquit the defendant of all three conspiracy offenses but it could only convict her of one conspiracy offense.

On the verdict form for the substantive crime, the jury convicted the defendant of second degree burglary and rejected first degree burglary and first degree criminal trespass. On the conspiracy verdict form, the jury convicted the defendant of conspiracy to commit first degree burglary and rejected conspiracy to commit second degree burglary and conspiracy to commit criminal trespass.

From the evidence, arguments, instructions and verdicts, I conclude that the jury considered and rejected the defendant's claim that she did not intend to steal Cheever's property when she entered his room. By convicting the defendant of conspiracy to commit first degree burglary, the jury accepted the prosecution's theory that the defendant and her four acquaintances agreed to break into Cheever's room and steal his property. Convicting the defendant of conspiracy to commit first degree burglary also required the jury to find that the conspirators planned to use a deadly weapon or commit an assault in carrying out the crime.

By convicting the defendant of second degree burglary and rejecting first degree burglary, the jury necessarily found that a deadly weapon or assault was not used in the actual commission of the burglary. By rejecting first degree criminal trespass, the jury rejected the defendant's argument that she did nothing more than commit criminal trespass by knowingly and unlawfully entering or remaining in Cheever's room.

For all of these reasons, I do not agree that the error in the theft instruction was plain error. This jury was not misled. Accordingly, I respectfully dissent from part V of the majority opinion and from the court's judgment.